# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

RAY SCOTT HEID, et al.,         :
                                       :

        **Plaintiffs,**         :

                                       :       **Case No. 2:18-CV-311**

        **v.**                     :

                                       :       **JUDGE ALGENON L. MARBLEY**

GARY MOHR, et al.,           :

                                       :       **Magistrate Judge Deavers**

        **Defendants.**        :

## OPINION & ORDER

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction (ECF No. 38) and Motion to Recuse (ECF No. 10). Plaintiffs seek to enjoin the Ohio Department of Rehabilitation and Corrections ("ODRC") from refusing Plaintiffs access to material of the Christian Separatist Church ("CSC"). On December 14, 2018, this Court held a 65.1 Conference to discuss the Plaintiffs' Motion for a Temporary Restraining Order ("TRO") and denied Plaintiffs' Motion for a TRO. The Court held a Preliminary Injunction hearing on January 11, 2019, at 9:30 a.m. For the reasons set forth below, Plaintiffs' Motion for a Preliminary Injunction and Motion to Recuse are **DENIED.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are inmates at Ohio correctional facilities. Plaintiff Ray Scott Heid is incarcerated at Southeastern Correctional Complex ("SCC"), and Plaintiff James Damron is incarcerated at Ross Correctional Institution ("RCI"), where Plaintiff Heid was previously held. Plaintiffs Ray Scott Heid and James E. Damron are Christian Separatists who allege that Ohio prison officials are denying them access to religious literature in violation of the First Amendment, Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons

Act ("RLUIPA"). Plaintiffs allege that in 2015, their Christian Separatist literature was removed from the prison and taken from their individual possession. Plaintiffs have complained that they no longer have access to *Positive Christianity in the Third Reich*, *Was Adolf Hitler a Bible Christian?*, and *Christian Principles of National Socialism* in the prison library. (ECF No. 37 at 7). Plaintiff Damron alleges that officials confiscated *Positive Christianity in the Third Reich* and *Mein Kampf*, and Plaintiff Heid alleges ODRC confiscated *Mein Kampf* in December 2015. Additionally, Plaintiffs allege that they cannot access CSC sermons on CDs.

ODRC has prohibited this material on two grounds. First, ODRC regards the swastika as a symbol of a security threat group ("STG"). Second, ODRC policy 5120-9-19, PRINTED MATERIAL states the following:

> Printed material is excludable if it is deemed to be detrimental to, or pose a threat to the rehabilitation of inmates; the security of the institution; or the good order or discipline of the institution. Examples of such material include, but are not limited to printed material:
> (1) Which facilitates, encourages, incites, promotes, or instructs, in criminal activity such as rioting or illegal drug use.
> (2) Which depicts, encourages, incites, or describes activities which may lead to the use of physical violence against others.

(ECF No. 38 at 5). In December 2015, ORDC officially banned *Positive Christianity in the Third Reich* and *Was Adolf Hitler a Bible Christian?*. (ECF No. 37 at 7). ODRC specifically justified banning *Positive Christianity in the Third Reich* based on the swastika on the cover.

Plaintiffs argue in their Second Amended Complaint that ODRC's policies are discriminatory because ODRC allows Hindus to use the swastika, allows other books containing the swastika in the RCI library, and allows the swastika as used in JPay's KA Lite videos on Nazi Germany. (ECF No. 37 at 8). Additionally, the Magen-David star (also known as the Star of David or six-pointed star) is allowed within the prison system even though gangs use it as a symbol. Plaintiffs allege that "white gangs have their own gang symbols distinct from the

swastika."  (ECF No. 37 at 13).  Plaintiffs' Motion for Preliminary Injunction, however, has focused solely on the alleged First Amendment and RLUIPA violations.  This Court will therefore address only the First Amendment and RLUIPA claims under the Preliminary Injunction standard.

## II.  MOTION FOR RECUSAL

Plaintiff Heid has moved to recuse the Court under 28 U.S.C. § 455(a), (b)(1) & (3). (ECF No. 10).  Recusal is appropriate where a judge's "impartiality might reasonably be questioned," 28 U.S.C. § 455(a), or "[w]here he has a personal bias or prejudice concerning a party . . . ," 28 U.S.C. § 455(b)(1), or "expressed an opinion concerning the merits of the particular case in controversy."  § 455(b)(3).  The Court orally denied Plaintiff Heid's motion at the Preliminary Injunction hearing and sets forth its rationale more fully below.

As this Court explained in its denial of Plaintiff Heid's motion to recuse in *The Christian Separatist Church Society of Ohio, the Wife of Christ, Prosopopeia, et al. v. Ohio Dep't of Rehab. and Corrs. et al.*, 2:15-cv-2757 ("*Christian Separatist I*"), § 455 "is not based on the subjective view of a party," but, rather, "imposes an objective standard: a judge must disqualify himself where a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Burley v. Gagacki*, 834 F.3d 606, 615-16 (6th Cir. 2016) (citations and quotations omitted).  (2:15-cv-2757, ECF No. 60).  This is a high standard.  As the Sixth Circuit explained in *Lyell v. Renico*,

> [A] judge's misconduct at trial may be "characterized as bias or prejudice" only if "it is so extreme as to display clear inability to render fair judgment," Liteky v. United States, 510 U.S. 540, 551 (1994) (internal quotation marks omitted), so extreme in other words that it "display[s] a deep-seated favoritism or antagonism that would make fair judgment impossible," *id.* at 555. "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases ordinarily do not support a bias or partiality challenge.... [But] they will do so if they reveal such a high degree of favoritism or antagonism

3

as to make fair judgment impossible." *Id.* (emphasis omitted). "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women ... sometimes display," by contrast, do not establish such bias or partiality. *Id.* at 555-56; *see also In re Murchison*, 349 U.S. 133, 136 (1955); *Offutt v. United States*, 348 U.S. 11, 17 (1954).

*Lyell v. Renico*, 470 F.3d 1177, 1186–87 (6th Cir. 2006) (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)), abrogated on other grounds as recognized in *English v. Berghuis*, 529 F. App'x 734, 744-45 (6th Cir. 2013).

Plaintiff Heid alleges a number of supposed instances of bias stemming from this Court's rulings in *Christian Separatist I*. Plaintiff Heid alleges that the Court disregarded the law, disregarded Plaintiffs' facts, created a defense for the Defendants, and deprived Plaintiff of his right to trial by jury. (ECF No. 10 at 18).

Plaintiff Heid focuses much of his Motion on the Court's use of the term "segregated" to describe the Christian Separatists' request for separate congregate worship in *Christian Separatist I*. Plaintiff Heid alleges that the term "segregated" implies racial segregation, which Plaintiffs did not request. Plaintiff Heid alleges bias because the Court acknowledged that Plaintiffs were not seeking racially segregated worship services but then in upholding ODRC's policy prohibiting congregate worship, the Court noted that "racially segregated worship is not tenable in a prison setting." (2:15-cv-2757, Doc. No. 110 at 13). This Court has already responded to such claims in a Motion to Recuse in *Christian Separatist I*. (2:15-cv-2757, Doc. No. 60). The Court will note here, however, that in addition to the reasons already given in denying the Motion to Recuse in *Christian Separatist I*, the Sixth Circuit recently described Plaintiff's contention that the request for separate congregate worship was not a request for racially segregated worship as "disingenuous at best." (*Christian Separatist Church Society of*

*Ohio, the Wife of Christ, Prosopopeia, et al. v. Ohio Dep't of Rehab. and Corrs. et al.*, No. 18-3404, slip op. at 7 (6th Cir. Feb. 13, 2019)).

Plaintiff Heid also takes issue with the Court's conclusion that the "issues of white supremacy that are deeply intertwined with Plaintiffs' 'militant' religion foster animosity and are . . . likely to fuel racial violence." (ECF No. 10-1 at 1 (quoting 2:15-cv-2757, Doc. No. 110 at 12–13)). Plaintiff Heid asserts that the Court's opinions show that the Court believes the Plaintiffs to be white supremacists and that such a belief would show that the Court is biased against the Plaintiffs. Plaintiff Heid's affidavit defines white supremacy and concludes that the Court saw Christian Separatism's beliefs as a "worldview . . . of white slave masters with violent control or power over other races." (ECF No. 10-1 at 2). But that is Plaintiff Heid's interpretation of "white supremacy" as applied to Christian Separatism, not this Court's. Moreover, Plaintiff Heid misreads the Court's pronouncement. The quoted language does not identify Plaintiffs as white supremacists; rather, the Court observed that Christian Separatism is intertwined with white supremacist ideas.

Plaintiff Heid has cited three other rulings from the Court in *Christian Separatist I* as alleged instances of bias. The first is this Court's construction of the Plaintiffs' complaint as bringing an RLUIPA claim against defendants in their individual capacity. The second is the Court's denial of Plaintiffs' Motion to Amend Complaint in *Christian Separatist I*, and the Court's subsequent dismissal of *Damron v. Dodrill* as duplicative of the claims in *Christian Separatist I*. (ECF No. 10 at 9, 15–18). Third, Plaintiff Heid has alleged that the Court deprived him of his right to have facts found by a jury. (ECF No. 10 at 7).

As to Plaintiff Heid's first contention, Plaintiff's complaint in *Christian Separatist I* separately named as defendants the Ohio Department of Rehabilitation and Corrections and

individual officers of ODRC and specifically stated that the suit was against the individual defendants in their official and individual capacities. Although this Court liberally construes *pro se* complaints, this Court need not "conjure allegations on a litigant's behalf." *Erwin v. Edwards*, 22 F. App'x 579, 580 (6th Cir. 2001). Although Plaintiff Heid argues that this Court construed his RLUIPA claim "under an unsound individual capacity" theory, the Court allowed Plaintiffs' RLUIPA claims to proceed against the Defendants in their individual capacities. (ECF Nos. 12, 42). The Court never decided that Plaintiff Heid could not bring an RLUIPA claim against Defendants in their individual capacities. Instead, the Court granted summary judgment for the Defendants because the Court found ODRC's policy permissible under RLUIPA. (ECF No. 110 at 13). The Court explicitly stated that it was not reaching the question of whether RLUIPA allowed a claim against Defendants in their individual capacities. (ECF No. 110 at 5).

Second, Plaintiff Heid alleges that he should have been permitted to amend his complaint in *Christian Separatist I* and that the Court erred by denying that amendment and then dismissing Plaintiffs' action in *Damron et al. v. Dodrill et al.*, 2:17-cv-337 because "Plaintiffs did not assert any new material facts that cure any deficiencies in their claims dismissed in *Christian Separatist I* . . . ." (2:17-cv-337, Doc. No. 1 at 3–4). Plaintiff Heid asserts that this conclusion was incorrect because the claims in *Christian Separatist I* were based on denial of separate congregate worship services, and the complaint in *Damron v. Dodrill* included the additional claims to have Christian Separatism recognized as a legitimate religion in ODRC and several instances of alleged retaliation and discrimination against Christian Separatists. The allegations in the complaint in *Damron v. Dodrill* were included in two requests to amend the complaint in *Christian Separatist I* (ECF Nos. 26, 41), both of which were denied. (ECF Nos.

33, 88).  The Sixth Circuit reviewed the denial of the second motion to amend the complaint in *Christian Separatist I* and found that "[t]he court properly concluded that the proposed amendments would be futile."  *Christian Separatist Church Society of Ohio, the Wife of Christ, Prosopopeia, et al. v. Ohio Dep't of Rehab. and Corrs. et al.*, No. 18-3404, slip op. at 8 (6th Cir. Feb. 13, 2019).  Therefore, Plaintiff Heid's contention that he should have been allowed to amend his complaint fails and so does his contention that *Damron v. Dodrill* should not have been dismissed because of duplicative claims.

Finally, this Court did not usurp the role of a jury in ruling on any of Plaintiff Heid's motions.  On a motion for summary judgment, this Court is required to evaluate whether there is a genuine dispute of material fact.  In so doing, this Court must evaluate to some extent the Plaintiffs' proffered evidence to determine whether they have raised a genuine dispute of material fact.  That is all this Court did in granting summary judgment for Defendants in *Christian Separatist I.*

Plaintiff Heid has failed to show any actual bias or prejudice on the Court's behalf that would require judicial disqualification.  Given Plaintiff Heid's arguments for recusal, it is hard to see how any ruling that finds against Plaintiff or disagrees with his view of his religion would satisfy Plaintiff Heid as having received a fair adjudication.  But it is not the role of this Court to adopt, wholesale, Plaintiff's views.  When a plaintiff comes before the court, he does so with his best arguments and is met with the same from his opponents.  It is the court's task to evaluate the arguments, determine which law governs, and apply the law to the facts.  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  But this does not mean that the Court must blindly accept any fact a plaintiff puts forth as having raised a *genuine* dispute of *material* fact.

RLUIPA requires that courts give deference to the experience and expertise of prison officials. This Court has done just that. This Court is not required to take Plaintiff's continued protestations that his religion does not pose a security risk as unrebutted fact. Because this Court's previous rulings would not lead "a reasonable person with knowledge of all the facts [to] conclude that the judge's impartiality might reasonably be questioned," *Burley*, 834 F.3d at 616, Plaintiff Heid's Motion to Recuse is **DENIED.**

### III.    PRELIMINARY INJUNCTION

The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In light of its "limited purpose," a preliminary injunction is "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). Accordingly, a party need not prove her case in full at a preliminary injunction hearing. *Id. But see Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (noting that the "proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion").

When considering a motion for preliminary injunction, a district court must balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 590–91 (6th Cir. 2012). These four considerations are "factors to be balanced, not prerequisites that must be met." *Certified Restoration*, 511 F.3d at 542. Whether the combination

of the factors weighs in favor of issuing injunctive relief in a particular case is left to the discretion of the district court. *See Leary*, 228 F.3d at 739. In the First Amendment context, however, "the likelihood of success on the merits often will be the determinative factor." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

## A. Likelihood of Success on the Merits

Plaintiffs have alleged violations of the First Amendment and RLUIPA. They bring their First Amendment claim under 42 U.S.C. § 1983 and their RLUIPA claim under 42 U.S.C. § 2000cc. This Court finds that the state has met its RLUIPA burden. Because the state has a higher burden under RLUIPA than under the First Amendment, and the state has met that higher burden, this Court does not address Plaintiffs' First Amendment claims. Before addressing those claims, however, a discussion of qualified immunity and standing are appropriate.

### 1. Qualified Immunity and Sovereign Immunity

This Court may sua sponte examine whether sovereign immunity or qualified immunity would bar Plaintiffs' claims. *S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008). Plaintiffs have sued Defendants in their individual and official capacities. At the preliminary injunction stage, they have asked only for injunctive relief as opposed to damages (which they have alleged in their complaint). As in *Mann v. Wilkinson*, No. 2:00-cv-0706, 2007 U.S. Dist. LEXIS 94002 (S.D. Ohio Dec. 21, 2007), "to the extent that [Plaintiffs] seek[] prospective injunctive relief concerning [their] religious [literature], qualified immunity is not a defense." *Id.* at *21.

### 2. Standing

Since the initial filing of the complaint, Plaintiff Heid has been transferred from RCI to SCC. The complaint and the TRO reference only events at RCI. Plaintiff Heid represented at

the Preliminary Injunction hearing that he still does not have the CSC CDs at SCC, nor is he allowed to have publications bearing the swastika. Plaintiff Heid thus has standing to pursue these claims. Plaintiff Damron's standing is not in doubt.

### 3. RLUIPA

Plaintiffs have alleged that ODRC's policies prohibiting access to Christian Separatist literature violate RLUIPA. RLUIPA states that "'no [state or local] government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution,' unless the government shows that the burden furthers 'a compelling governmental interest' and does so by 'the least restrictive means.'" *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005) (quoting 42 U.S.C. § 2000cc-1(a)(1)-(2)). RLUIPA applies to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc-2(a). Although the state must show that the burden furthers a compelling governmental interest in the least restrictive way, "[l]awmakers anticipated . . . that courts entertaining complaints under § 3 [of RLUIPA] would accord 'due deference to the experience and expertise of prison and jail administrators.'" *Cutter*, 544 U.S. at 717 (quoting 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sen. Hatch and Sen. Kennedy on RLUIPA)).

Plaintiffs have the burden to show both "that the relevant exercise of religion is grounded in a sincerely held religious belief" and "that the Department's . . . policy substantially burdened that exercise of religion." *Holt v. Hobbs*, 135 S.Ct. 853 (2015). If Plaintiffs meet their burden, then the state bears the burden of showing that the policy is the least restrictive means to further a compelling governmental interest.

The sincerely held belief inquiry focuses on the authenticity of a belief. *Haight v. Thompson*, 763 F.3d 554, 567 (6th Cir. 2014). Under RLUIPA, courts cannot conduct an

"inquiry into whether a particular belief or practice is "central" to [an individual's] religion." *Cutter*, 544 U.S. at 725 n.13. A prison, however, may "still . . . give some consideration to an organization's tenets" on the rationale that "the more a person's professed beliefs differ from the orthodox beliefs of his faith, the less likely they are to be sincerely held." *Haight*, 763 F.3d at 567 (citing *Vinning-El v. Evans*, 657 F.3d 591, 591 (7th Cir. 2011)). This Court does not doubt the sincerity of Plaintiffs' beliefs. The State at the Preliminary Injunction hearing attempted to show that Plaintiffs' beliefs are not a religion, although the State made no such argument in its Response in Opposition to the Preliminary Injunction.

Courts may consider whether a particular set of beliefs is a religion. *See, e.g.*, *Kaufman v. McCaughtry*, 419 F.3d 678, 681–82 (7th Cir. 2005); *Hale v. Federal Bureau of Prisons*, No. 18-1141, 2019 WL 117616, at *4–6 (10th Cir. Jan. 7, 2019). The Sixth Circuit has not articulated a test for whether a set of beliefs is a religion, but it has noted that in the RFRA context, the plaintiff must show a substantial burden to "a religious belief rather than a philosophy or way of life." *General Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010) (quoting *United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996)). *United States v. Meyers* lists five factors for whether a belief system is a religion: "ultimate ideas, metaphysical beliefs, moral or ethical system, comprehensiveness of beliefs, [and] accoutrements of religion." *Meyers*, 95 F.3d at 1483. Accoutrements of religion, in turn, includes whether a system of beliefs has: "[a] founder, prophet, or teacher; important writings; gathering places; keepers of knowledge; ceremonies and rituals; structure or organization; holidays; diet or fasting; appearance and clothing; and propagation." *Id.* at 1483–84. The Tenth Circuit's *Meyers* factors are similar to the Third Circuit's test. The Third Circuit considers whether the belief system includes: "(1) an attempt to address 'fundamental and ultimate

questions' involving 'deep and imponderable matters'; (2) a comprehensive belief system; and (3) the presence of formal and external signs like clergy and observance of holidays." *Sutton v. Rasheed*, 323 F.3d 236, 251 n.30 (3d Cir. 2003) (quoting *Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025, 1030 (3d Cir. 1981)).  The Seventh Circuit considers whether "a person sincerely holds beliefs dealing with issues of 'ultimate concern' that for her occupy a 'place parallel to that filled by . . . God in traditionally religious persons.'" *Kaufman*, 419 F.3d at 681 (quoting *Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680, 688 n.5 (7th Cir. 1994)).

Most courts to have addressed challenges brought by groups that hold racist beliefs have assumed without discussion that such groups hold beliefs which qualify as religious and are entitled to protection under the First Amendent, RLUIPA, or RFRA.  *See, e.g.*, *Mann*, 2007 U.S. Dist. LEXIS 94002 (considering an RLUIPA claim brought by members of the Christian Identity Church); *McCabe v. Arave*, 827 F.2d 634, 636–37 n.2 (9th Cir. 1987) (assuming that the Church Jesus Christ Christian, which includes "racial hatred, revenge and violence" and included the Aryan Nation as its "alter ego," was a religion for purposes of the First Amendment); *Murphy v. Missouri Dep't of Corrs.*, 814 F.2d 1252, 1255–56 (8th Cir. 1987) (finding that plaintiffs were not harmed when district court assumed without deciding that Church of Jesus Christ Christian was a religion).  In some cases, the defendants did not challenge that the beliefs in question constituted a religion.  *See Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006).  Courts to have addressed the issue have been split on whether groups that espouse views similar to the views of the Christian Separatist Church are religions.  The Tenth Circuit has found that "Creativity," which has as "one of [its] central tenets" the belief that "Good is personified by the White Race and the crusade for its future, while evil is personified by its antithesis in this world, the Jewish Race," is not a religion.  *Hale*, 2019 WL 117616, at *1–5.  But the Third Circuit has held that the

Nation of Islam, whose "members want to establish a separate territory where black people can live independently and 'believe the offer of integration is hypocritical and is made by those who are trying to deceive the black peoples into believing that their 400-year-old enemies . . . are, all of a sudden, their 'friends,'" is entitled to First Amendment protection as having "views . . . sufficiently rooted in religion." *Sutton*, 323 F.3d at 252. The Eighth Circuit cast significant doubt on a district court's determination that the Church of Jesus Christ Christian was not a religion, finding that "the district court may have erred in its conclusion that the inmates' beliefs are purely secular" and that "the inmates' religion may be comprehensive and that it may address fundamental and ultimate questions." *Wiggins v. Sargent*, 753 F.2d 663, 666 (8th Cir. 1985). The Eighth Circuit remanded the case to the district court for further consideration.

In addition to noting that RFRA, and therefore RLUIPA, required a claim based on "a religious belief rather than a philosophy or way of life," *General Conference Corp. of Seventh-Day Adventists*, 617 F.3d at 410, the Sixth Circuit has also opined that "a court's attempt to distinguish between what is or is not a religious belief might implicate the Establishment Clause." *New Doe Child #1 v. Congress of United States*, 891 F.3d 578, 588 n.4 (6th Cir. 2018) (citing *New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977)). While the State presented some evidence at the Preliminary Injunction hearing regarding what the Christian Separatist Church believes, including the Christian Separatist Catechism for the Anointed Nation, this issue was not sufficiently addressed by either party for this Court to determine whether Christian Separatism is a religion. Because this Court finds that the State has shown its decisions are the least restrictive means of furthering a compelling governmental interest, however, this Court need not reach the issue of whether Christian Separatism is a religion.

In order to prevail, Plaintiffs must show that the ODRC policy places a substantial burden on their religious exercise. A policy is a substantial burden if it "places substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Haight*, 763 F.3d at 565. Being forced to choose between violating religious beliefs and facing discipline in the prison context is a substantial burden. *Holt*, 135 S.Ct. at 862. RLUIPA prohibits inquiring into "whether the RLUIPA claimant is able to engage in other forms of religious exercise." *Id.* The State may be required "to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." § 2000cc-3(c).

Plaintiffs argue that ODRC's policies substantially burden their religious exercise because the policies prevent them from obtaining "full knowledge of truth." Plaintiffs allege that not having access to sermons on CDs prevents them from "fully study[ing] the precepts of [their] faith." (ECF No. 37 at 6–7). The State's arguments that Plaintiffs can still practice their faith individually, have sacred texts, and visit with clergy, ECF No. 44 at 12, are comparisons specifically prohibited under RLUIPA. *See Holt*, 135 S.Ct. at 862. Plaintiffs introduced next to no evidence regarding their religious CDs or the publication *Christian Principles of National Socialism*. Therefore, Plaintiffs have not carried their burden to show that not having these CDs or *Christian Principles of National Socialism* is a substantial burden. This Court will therefore address only Plaintiffs' claims regarding access to *Positive Christianity in the Third Reich*, *Was Adolf Hitler a Bible Christian?*, and *Mein Kampf–The Ford Translation*.

This Court doubts that prohibiting access to the challenged publications and prohibiting the swastika as a symbol is a substantial burden on Plaintiffs' free exercise rights. While courts hearing claims under RLUIPA are prohibited from inquiring into the truth of the religious beliefs, it is a threshold requirement for RLUIPA protection that an inmate's religious exercise

be substantially burdened. *Haight*, 763 F.3d at 565. *See also Smith v. Governor of Alabama*, 562 F. App'x 806, 813 (11th Cir. 2014) (finding that Plaintiff had not shown a substantial burden because he had not offered evidence that the items requested "were fundamental to his practice of Odinism or that the absence of the items caused anything more than a mere inconvenience on his religious exercise."). As Plaintiff Heid testified in response to the Court's questions at the Preliminary Injunction hearing, neither the New Testament nor the Old Testament requires the use of the swastika. The swastika is symbolic, and Plaintiff Heid testified that he uses the swastika to represent his faith and sees the swastika as an integral part of his religious practice. There is nothing in the record, or in generally accepted Christian doctrine, however, which supports the swastika as an integral part of the practice of Christianity. Thus, this Court finds that Plaintiff Heid's use of the swastika is not an integral part of his religious practice.

The Court is then left to consider whether restricting Plaintiffs' access to three books: *Positive Christianity in the Third Reich*, *Was Adolf Hitler a Bible Christian?*, and *Mein Kampf– The Ford Translation*, imposes a substantial burden on Plaintiffs' free exercise rights. A substantial burden may be upheld if it is the least restrictive means of furthering a compelling government interest. Courts are expected to defer to the judgment of prison officials "in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 713 (quoting Joint Statement of Hatch and Kennedy)). RLUIPA "does not elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 722.

Maintaining prison security is a compelling interest, but it must be the "actual purpose" behind ODRC's policies and actions, rather than mere "post hoc rationalizations." *Haight*, 763

F.3d at 562–63. Additionally, some consideration is due the connection between the accommodation requested and the security risk posed by *these particular Plaintiffs*. *See Haight*, 763 F.3d at 563 ("[W]e know next to nothing about why a sweat lodge presents a compelling security problem as to "that" particular group of inmates—the inmates who made the request and who filed this lawsuit."); *Mann*, 2007 U.S. Dist. LEXIS 94002, at *19 (denying summary judgment because, among other things, there was "no evidence that [Plaintiff] ever used the religious literature in question . . . to incite or promote acts of violence or to enlist prisoners in a gang."). The key distinction as to whether prison officials may prohibit racially inflammatory literature for security reasons is "whether prison officials are able to demonstrate, in a fashion not reasonably subject to dispute, that a particular piece of literature advocates not only separation of the races or supremacy of one race over another, but also violent acts in order to promote a racially separatist agenda." *Mann*, 2007 U.S. Dist. LEXIS 94002, at *17.

While the State has shown no link between these materials and violence from Plaintiffs Heid and Damron, the State has adduced evidence demonstrating that the publications encourage violence and include "inflammatory rhetoric." (ECF No. 44 at 12). The State has provided the following passage from *Mein Kampf* as an example:

> The only way to achieve success is through a constant and regular use of violence. This persistence can only happen with a definite intellectual and spiritual conviction backing it up. All violence not founded on a solid spiritual or intellectual basis is indecisive and uncertain.

(*Id.*). This passage includes a call to violence. Because of this call to violence, ODRC had a compelling interest in banning *Mein Kampf–The Ford Translation*.

ODRC also excluded *Positive Christianity in the Third Reich* and *Was Adolf Hitler a Bible Christian?* because of Nazi swastika symbolism that was "too inflammatory for prison environment," could be used by STGs, and could lead to violence. Def's. Ex. D-8 at 2; D-9 at 2.

At the Preliminary Injunction hearing, the State called Brian Niceswanger, the administrative assistant for the southeast regional director, as a witness. Mr. Niceswanger has worked in the office of prisons for ten years and been with the Department of Rehabilitation and Corrections for twenty years. In his current role, Mr. Niceswanger spends time in the prisons, works with security staff including local security group coordinators, and tracks violent incidents to determine how best to address such situations. He testified that the swastika is an incendiary symbol in the prison context and that white supremacist groups use that symbol to identify like-minded individuals and attempt to "group up."

The State also called Eric Graves, the STG coordinator at RCI. He has held that position since the end of June 2014. For four years before that, he was the STG coordinator at a level two institution. He has been with ODRC for more than twenty-eight years. In his position as STG coordinator at RCI, Mr. Graves tracks and monitors gang affiliations inside prisons. He testified that roughly forty-seven percent of inmates at RCI have a gang affiliation and that the swastika can lead to violent altercations inside prison. He also testified that it was important to know which inmates were affiliated with which gangs because it was important to not have too many inmates of one affiliation together in a cell block.

Finally, the State called Matthew Gillum, the south regional STG investigator, assistant coordinator for the department of corrections. He has been in that role for four years; prior to that, he was an STG coordinator assistant investigator. Mr. Gillum cast doubt on whether an officer would be able to determine during an altercation whether an individual with a swastika was using that swastika for gang purposes or for religious purposes. He also testified that gangs in prison engage in extortion and otherwise present a threat of violence.

The testimony from these prison officials shows that ODRC is acutely aware of the danger of prison gang activity and works actively to prevent such activity and any possible violence. This Court must defer to the experienced judgment of these prison officials.

While the State does not contest that Plaintiffs Heid and Damron have not been violent and are not members of an STG, the State has also introduced testimony that Heid and Damron having the swastika would make it more difficult for staff to identify STG members. Thus, the State's rationale for banning the swastika is not limited only to the security risk, if any, that Plaintiffs Heid and Damron pose, but rather takes into account the increased burden on ODRC staff to respond to prison altercations or prevent gang activity and affiliations. Nothing in RLUIPA, nor Sixth Circuit precedent, prohibits the State from basing its compelling justification on the strain on prison staff and resources.

Once a policy furthers a compelling government interest, "the Court must determine whether the . . . policy as applied to plaintiff is the least restrictive means of enforcing the compelling interest." *Glenn v. Ohio Dep't of Rehab. & Corr.*, 2018 U.S. Dist. LEXIS 80833, at *9–10 (N.D. Ohio May 14, 2018). Although the State "bears the burden of proof to show its practice is the least-restrictive means, it is under no obligation to dream up alternatives that the plaintiff himself has not proposed." *Christian Separatist Church Soc'y v. Ohio Dep't of Rehab. & Corr.*, No. 2:15-cv-2757, 2018 U.S. Dist. LEXIS 54984, at *10 – 11 (S.D. Ohio Mar. 30, 2018) (Marbley, J), but, "defendants must show that alternatives . . . were considered." *Hardaway v. Haggerty*, No. 05-70362, 2011 WL 761494, at *6 (E.D. Mich. Feb. 25, 2011). The Court "'must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries' and may correctly consider '[c]ost to the government' as an 'important factor.'" *Christian Separatist Church Soc'y v. Ohio Dep't of Rehab. & Corr.*, 2011 WL 761494

at *11 (quoting *Equal Employment Opportunity Comm'n v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 593 (6th Cir. 2018).  Additionally, "once prison officials have provided expert testimony sufficient to justify the security regulation and resultant impingement of prisoner rights, 'the courts must defer to the expert judgment of the prison officials unless the prisoner proves by substantial evidence that the officials have exaggerated their response to security considerations."  *Hoevenaar v. Lazaroff*, 422 F.3d 366, 370 (6th Cir. 2005) (quoting *Espinoza v. Wilson*, 814 F.2d 1093 (6th Cir. 1987)).

The only alternative that the Plaintiffs have suggested is that the CDs be kept in the main library.  (ECF No. 38 at 14).  The Plaintiffs have not met their burden under RLUIPA of showing that not having access to these CDs is a substantial burden on their religion.  Even if it were, however, tt is hard to see how such a solution is a less restrictive alternative.  The State has argued that these materials incite violence.  Whether inmates have these materials in their cells or in the prison library, they present the same risk of violence.  The Defendants assert that they cannot allow these Plaintiffs to have accommodations without compromising security and fostering resentment.  These are rationales that courts consider in determining whether a prison's approach is the least restrictive means of ensuring prison safety.  *Hoevenaar*, 422 F.3d at 371–72.  The Southern District of Ohio in *Mann v. Wilkinson* considered the possibility of redacting violent phrases, but Plaintiffs have suggested no such solution.  *Mann*, 2007 U.S. Dist. LEXIS 94002, at *21.  Thus, because the banned material threatens prison safety and Plaintiffs have not offered alternatives, on the record from the Preliminary Injunction hearing, the State would likely prevail in showing that the ban on *Positive Christianity in the Third Reich*, *Was Adolf Hitler a Bible Christian?*, and *Mein Kampf–The Ford Translation* are the least restrictive means of furthering prison safety.

*Haight v. Thompson* does not suggest otherwise. The Sixth Circuit in *Haight* rejected prison official's argument that they could not accommodate inmates under RLUIPA because doing so would require making an exception to prison rules that would open the proverbial floodgates for more exceptions. Making exceptions is the whole point of RLUIPA, and "[r]ejecting accommodation requests on the ground that an exception to a general prison policy will make life difficult for prison wardens . . . has no place as a stand-alone justification under RLUIPA." *Haight*, 763 F.3d at 562. Here, the State is not rejecting Plaintiffs' requests for the swastika merely because doing otherwise would require making an exception to the rules. Rather, the State has shown that the swastika is a symbol that can foster gang activity. This is a far cry from the sweat lodge at issue in *Haight*, which prison officials asserted almost without justification, was a security risk.

A prison's regulation fails under RLUIPA if "the prisoner proves by substantial evidence that the officials have exaggerated their response to security considerations." *Hoevenaar*, 422 F.3d at 370 (quoting *Espinoza*, 814 F.2d at 1099). Plaintiffs argue that banning Christian Separatists' use of the swastika is arbitrary and irrational because the swastika is allowed in other contexts, namely by Hindus and for use in historical narratives about Nazi Germany. They also allege that the Star of David is a gang symbol that is allowed while the swastika is not. (ECF No. 38 at 12). Plaintiffs have argued that banning the swastika because of associations it may have to gangs is arbitrary because gangs have their own, unique symbols. (ECF No. 38 at 18). This is not substantial evidence of an exaggerated response. Defendants have asserted that the Hindu swastika is different from the swastika used in the Plaintiffs' requested publications and Plaintiff Damron admitted that the Hindu swastika may be somewhat different from the swastika Plaintiffs seek to access. ODRC does not ban all literature from the Christian Separatist Church,

only the swastika.  *See, e.g., Murphy v. Missouri Department of Corrections*, 824 F.2d 1252 (8th Cir. 1987) (finding a prison regulation banning all Aryan Nations literature overbroad). Therefore, Plaintiffs Heid and Damron have not shown a strong likelihood of success on the merits.

This ruling comports with this Court's pronouncement in *Damron et al. v. Jackson*, No. 2:09-cv-50, 2011 WL 4402767 (S.D. Ohio Sept. 21, 2011).  In *Damron v. Jackson*, this Court followed the reasoning of *Mann v. Wilkinson* and denied summary judgment for Defendants, finding a genuine issue of material fact as to whether ODRC's banning of religious literature was the least restrictive means of furthering the compelling interest in prison security.  *Damron v. Jackson*, 2011 WL 4402767 at *6.  The Court noted that "Defendant has identified no more specific information, such as quotations from these materials calling for violence or records of incidents involving Damron (or any other person) employing such materials to promote violence or gang affiliation."  *Id.*  Here, ODRC has pointed the Court to quotes from *Mein Kampf–The Ford Translation* advocating violence and introduced substantial evidence to support its compelling interest in banning the swastika as an STG identifier.  Additionally, the Summary Judgment Order in *Damron v. Jackson* decided only that Damron's claims could proceed; it did not decide that Damron's claims were meritorious.  Similarly, this Court limits its analysis on a motion for preliminary injunction to whether Plaintiffs have shown a *strong likelihood* of success and not whether Plaintiffs have proved or failed to prove the merits of their claims.  The Court is limited to the arguments and evidence advanced in the parties' pleadings and at the Preliminary Injunction hearing.

**B. Irreparability of Harm, Substantial Harm to Others, and Public Interest**

In the First Amendment context "the likelihood of success on the merits often will be the determinative factor." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). Although RLUIPA imposes standards different from those under the First Amendment, RLUIPA provides statutory protection for First Amendment values. Therefore, the likelihood of success on the merits is also key in the RLUIPA context. *See, e.g.*, *Buchanan v. Burbury*, 2006 U.S. Dist. LEXIS 48244 (N.D. Ohio July 17, 2006). Supreme Court precedent is clear that "even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989). Because the Plaintiffs are not likely to succeed on their RLUIPA claim, they have not shown irreparable harm. Nor have Plaintiffs shown that granting the preliminary injunction is in the public interest. Showing a constitutional violation would also generally show that granting a preliminary injunction does not pose a substantial harm to others. Here, however, the Court considers the possible harm to ODRC employees and other inmates if Plaintiffs are allowed access to their requested literature and are allowed to possess images of the swastika. If such symbol does lead to violence or burdens prison officials, the prison system could be substantially disrupted. Therefore, Plaintiffs have not met the substantial harm to others prong of the preliminary injunction test.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiffs' Motions are **DENIED.**

**IT IS SO ORDERED.**

**    s/Algenon L. Marbley            **
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**


**DATED:  March 4, 2019**