**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**RAY SCOTT HEID,** *et al.***,**

      **Plaintiff,**

                             **Case No. 2:18-cv-311**
          **v.**                   **Chief Judge Algenon L. Marbley**
                             **Magistrate Judge Elizabeth P. Deavers**

**GARY MOHR,** *et al.***,**

      **Defendants.**

**REPORT AND RECOMMENDATION**

This matter is before the Undersigned for a Report and Recommendation on Defendants'
Motion for Summary Judgment, ECF No. 227 ("Defendants' Motion"), and Plaintiffs' Motion
for Summary Judgment, ECF No. 229 ("Plaintiffs' Motion"). For the following reasons, the
Undersigned **RECOMMENDS** that the Court **GRANT** Defendants' Motion, **DENY** Plaintiffs'
Motion, and award summary judgment in Defendants' favor on all of Plaintiffs' claims.

**I.**

Plaintiffs are inmates under the supervision of the Ohio Department of Rehabilitation and
Corrections ("ODRC"), and they allege that "[t]he resistance of ODRC officials to make an
exception for Aryan-American symbolism has placed a substantial burden upon [their] practice
of religion." (ECF No. 37 at PAGEID # 1158.) Specifically, Plaintiffs aver that they are devout
Christian Separatists,[1] a religion they state is tied to their ethnic identity as Aryan-Americans,

---

[1] The Undersigned will hereafter use "CS" to refer to Christian Separatism.

and that Defendants have unconstitutionally infringed upon their right to practice CS by limiting their ability to use swastikas and espouse separatist views. (*See generally* ECF No. 37.)[2]

Plaintiffs initiated this action on April 9, 2018, alleging that Defendants[3] violated their rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and 42 U.S.C. § 1983 in 2015 by removing their "religious literature" – specifically three books, entitled *Positive Christianity in the Third Reich*, *Was Adolf Hitler a Bible Christian?*, and *Christian Principles of National Socialism*, as well as certain CS-related CDs and an additional piece of literature entitled *Christian Principles of National Socialism* – from the Ross Correctional Institute ("RCI") library.[4] (*See generally* ECF No. 1.) Plaintiffs allege that Defendants removed

---

[2] This is far from the first time Plaintiffs have challenged the ODRC's response to their CS beliefs, as over the past fourteen (14) years they have litigated the following actions against various ODRC officials: *Damron, et al. v. Jackson*, Case No. 2:09-cv-50; *The Christian Separatist Church Society of Ohio, the Wife of Christ, Prosopopeia, et al. v. Ohio Dep't of Rehab. and Corrs. et al.*, Case No. 2:15-cv-2757 ("*Christian Separatist*"); *Damron, et al. v. Dodrill, et al.*, Case No. 2:17-cv-337; *Heid v. Hooks*, Case No. 2:17-cv-650; and *Heid, et al. v. Aderholt, et al.*, Case No. 2:20-cv-901 ("*Aderholt*"). While Plaintiffs' claims have been framed many ways over the course of these actions, Plaintiffs have consistently alleged the infringement of their Constitutional rights by ODRC officials given Plaintiffs' CS beliefs.

[3] Plaintiffs name the following ten Defendants in the operative Second Amended Complaint: (1) Gary C. Mohr, Director of ODRC; (2) Roger Wilson, Chief Inspector of ODRC; (3) Trevor Clark, Assistant Chief Counsel of Legal Services at the Operations Support Center within ODRC; (4) Donna Skaggs, employee within the Bureau of Classification at the OSC within the ODRC; (5) Ryan Dolan, Chairperson of the Publication Screening Committee ("PSC") and Staff Counsel at the OSC within the ODRC; (6) Matt Gillum, Southern Regional STG Coordination within the ODRC; (7) Scott Gobels, a Sergeant at RCI; (8) Eric Graves, a Lieutenant STG Coordinator at RCI; (9) D.J. Norris, STG Supervisor of ODRC; and (10) Jennifer Williams, Deputy Warden of Special Services at RCI. (ECF No. 37 at PAGEID ## 1154-1157.) Plaintiffs sue each Defendant in their individual and official capacities, except that Plaintiffs sue Defendants Mohr and Williams in their official capacities only. (*Id.*)

[4] The events underlying this action occurred while Plaintiffs were incarcerated at RCI, but Plaintiffs no longer reside there. (*See* ECF No. 229 (indicating that Plaintiff Heid resides at Lebanon Correctional Institution), ECF No. 238 (indicating that Plaintiff Damron resides at the Correctional Reception Center).)

these materials because they contain images of swastikas and espouse separatist messages,[5] all of which Plaintiffs acknowledge are prohibited by the ODRC.  (*Id.*)  Plaintiffs also allege that on October 20, 2015, Defendants set a Rules Infraction Board ("RIB") hearing (related to the confiscation of a birthday card in Plaintiff Heid's possession which included the image of a swastika) without affording Plaintiff Heid twenty-four hours to prepare, depriving him of due process.  (*Id.*)

Plaintiffs moved for a Preliminary Injunction, so in January 2019 the Court held a two-day Preliminary Injunction hearing.  (*See* ECF Nos. 58-59.)  On March 4, 2019, the Court denied Plaintiffs' Motion for Preliminary Injunction.  (ECF No. 57.)  On June 17, 2019, the Undersigned issued a Report and Recommendation, recommending that Defendants' Motion to Dismiss be granted in part, with respect to Defendants Mohr and Wilson under a theory of *respondeat*

---

[5] Among the separatist messages promoted by these publications is the phrase "blood and honor," a well-known white supremacist phrase.  Indeed, there is a white supremacist group by the name Blood and Honour, which the United States Court of Appeals for the Eleventh Circuit has described as follows:

> Blood and Honour is a white supremacist group that began in England for the purpose of protecting the "superior" race of white people. The group is part of the skinhead movement and espouses the teachings of Nazi Germany's Third Reich and Adolf Hitler. Blood and Honour members consider non-white persons to be subhuman enemies who should be eliminated, or at least radically segregated and relocated away from whites. The group views homeless people as degenerate and worthless to society. They anticipate a future uprising of whites and a race war in the United States, and thus are inclined to prepare themselves for war. The group's members thrive on proving themselves to one another by perpetrating violent acts against their rivals and enemies.

*United States v. Robertson*, 736 F.3d 1317, 1322 (11th Cir. 2013).  Consistent with this, Plaintiff Heid has testified that "blood and honor" refers to "[t]he Germans" and that within CS the phrase "blood and honor" means to honor white people ("the people from one blood"), because Christian Separatists believe that (only) white people were created in God's image.  (ECF No. 58 at PAGEID ## 1428-1429.)

*superior*, and denied in part, with respect to the statute of limitations, Eleventh Amendment, qualified immunity, failure to state a claim under § 1983, and with respect to Defendant Clark under a theory of *respondeat superior*. (ECF No. 75.) On March 31, 2020, the United States Court of Appeals for the Sixth Circuit affirmed the Court's March 4, 2019 Order. (ECF No. 127.) On April 22, 2020, the Court adopted the Undersigned's June 17, 2019 Report and Recommendation in its entirety and dismissed Defendants Mohr and Wilson. (ECF No. 128.)

On July 15, 2022, the parties filed their respective Motions for Summary Judgment. (ECF Nos. 227, 229.) On August 8, 2022, Defendants filed a response in opposition to Plaintiffs' Motion. (ECF No. 231.) On August 17, 2022, Plaintiffs filed their objections to Defendants' Motion. (ECF No. 234.) On August 26, 2022, Defendants filed a reply brief in further support of Defendants' Motion. (ECF No. 235.) Plaintiffs did not timely file a reply brief, so on September 15, 2022 the Court directed Plaintiffs to file a status report detailing the status of their reply brief. (ECF No. 236.) On September 28, 2022, Plaintiffs filed a Status Report in the *Aderholt* case, advising the Court that "they rest on the summary judgment arguments asserted in their Motion for Summary Judgment [] and Plaintiffs' Objections to Defendants' Summary Judgment Motion []." (*See Aderholt*, Case No. 2:20-cv-901, ECF No. 87.) The subject Motions are therefore ripe for judicial review.

## II.

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The burden of proving that no genuine issue of material fact exists falls on the moving party, "and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stransberry v. Air Wisconsin Airlines Corp.*, 651

4

F.3d 482, 486 (6th Cir. 2011) (citing *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001)); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'" *Kimble v. Wasylyshyn*, 439 F. App'x 492, 495 (6th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317-324 (1986)); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "The nonmovant must, however 'do more than simply show that there is some metaphysical doubt as to the material facts,' . . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a 'genuine' dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (citations omitted).

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stransberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

## III.

In the operative Second Amended Complaint, Plaintiffs assert claims arising under the RLUIPA and 42 U.S.C. § 1983. (*See generally* ECF No. 37.) All of these claims are at issue in the underlying cross-briefing. The Undersigned will analyze each in turn below, but first must discuss whether some of Plaintiffs' claims are moot.

**A.** **Plaintiffs' Claims Regarding CS-Related CDs and *Christian Principles of National Socialism*.**

As a preliminary matter, two of Plaintiffs' specific claims were that Defendants removed certain CS-related CDs and a piece of literature entitled *Christian Principles of National Socialism* from the RCI library. (*See* ECF No. 37.) Plaintiffs therefore sought the return of such materials to the RCI library. (*Id.*) In its March 31, 2020 Order, however, the Sixth Circuit held that Plaintiffs' claims regarding these materials were moot:

> But even if we assume the plaintiffs were likely to succeed in showing that the denial of access to the CDs and *Christian Principles of National Socialism* substantially burdened their religious exercise, the plaintiffs' grievance was that these materials were not available in the RCI library. **They do not allege that ODRC banned these materials in all its facilities or that these materials were in their personal possession and were permanently confiscated from them.** Indeed, Damron testified at the preliminary-injunction hearing that *Christian Principles of National Socialism* has not been excluded from possession within the ODRC and that he can still access it. Although Heid testified at the preliminary injunction hearing that he still could not access the CDs at his new facility, which at the time was Southeastern Correctional Complex, he has since moved to another facility—Lebanon Correctional Institution. Damron has also been transferred to another facility—Trumbull Correctional Institution.
>
> There is no allegation in the complaint nor evidence in the record that either Heid or Damron is being denied access to the CDs or to *Christian Principles of National Socialism* at his new facility. Thus, **because the plaintiffs' claims about these materials were specific to their former places of confinement, their request for injunctive relief related to these materials is moot**. *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996).

6

(ECF No. 127 at PAGEID ## 2168-2169 (emphasis added).)  Plaintiffs did not challenge the Sixth Circuit's finding on this point.

This Court is bound by the Sixth Circuit's holding that Plaintiffs' claims regarding the CS-related CDs and *Christian Principles of National Socialism* are moot.  *Moody v. Michigan Gaming Control Bd.*, 871 F.3d 420, 425 (6th Cir. 2017) ("The law-of-the-case doctrine precludes reconsideration of issues decided at an earlier stage of the case.") (internal quotation marks omitted) (quoting *Caldwell v. City of Louisville*, 200 Fed.Appx. 430, 433 (6th Cir. 2006)); *see also Daunt v. Benson*, 999 F.3d 299, 308 (6th Cir. 2021) (noting that the law of the case doctrine "is primarily intended to enforce a district court's adherence to an appellate court's judgment") (internal quotation marks and citation omitted).  Plaintiffs have not presented any new factual allegations, let alone any evidence, that suggests that ODRC banned these materials in all of its facilities or that these materials were in their personal possession and were permanently confiscated from them.  And as the Sixth Circuit noted, Plaintiffs do not presently reside at RCI. (*See* ECF Nos. 229, 238.)  Plaintiffs' request for injunctive relief regarding these materials are therefore moot.  *Kensu*, 87 F.3d at 175.

Accordingly, it is **RECOMMENDED** that the Court **GRANT** Defendants' Motion for Summary Judgment, and **DENY** Plaintiffs' Motion for Summary Judgment, insofar as they pertain to Plaintiffs' claims regarding the removal of CS-related CDs and *Christian Principles of National Socialism* from the RCI library**.**

B.     **Plaintiffs' RLUIPA Claim.**

First, Plaintiffs assert a claim under the RLUIPA, alleging that "their sincerely held religious beliefs have been substantially burdened" by Defendants' removal of various CS-related literature and CDs which contained swastikas and espoused separatist messages, and that

Defendants' actions "are not the least restrictive means in performing a compelling governmental interest."  (ECF No. 37 at PAGEID ## 1173-1174.)

The RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government establishes that the burden furthers "a compelling governmental interest" and does so by "the least restrictive means."  42 U.S.C. § 2000cc-1(a); *see Cutter v. Wilkinson*, 544 U.S. 709, 715, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).  The RLUIPA "protects 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'"  *Holt v. Hobbs*, 574 U.S. 352, 360, 135 S.Ct. 853, 190 L.Ed.2d 747 (2015) (quoting 42 U.S.C. § 2000cc-5(7)(A)).  In the prison context, a burden is substantial where it forces an individual to choose between confronting "serious disciplinary action" for following his religious beliefs, or complying with a policy that requires him to "engage in conduct that seriously violates [his] religious beliefs."  *Id.* at 360-361 (alteration in original) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014)); *see Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 733–34 (6th Cir. 2007).  Although the state must show that the burden furthers a compelling governmental interest in the least restrictive way, "[l]awmakers anticipated . . . that courts entertaining complaints under § 3 [of RLUIPA] would accord 'due deference to the experience and expertise of prison and jail administrators.'"  *Cutter*, 544 U.S. at 717 (quoting 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sen. Hatch and Sen. Kennedy on RLUIPA)).

"Analysis under RLUIPA is a 'three-act play."  *Fox v. Washington*, 949 F. 3d 270, 277 (6th Cir. 2020) (quoting *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019)).  At

the first and second steps, the plaintiff bringing a claim under RLUIPA bears the burden of showing that "the relevant exercise of religion is grounded in a sincerely held religious belief" and that the challenged "policy substantially burdened that exercise of religion." *Holt*, 574 U.S. at 361.  If the plaintiff meets that burden, the analysis then proceeds to the third step where the burden shifts to the defendant to show that the policy "(1) [was] in furtherance of a compelling governmental interest; and (2) [was] the least restrictive means of furthering that compelling governmental interest." *Id.* at 362 (alterations in original) (quoting 42 U.S.C. § 2000cc–1(a)).

The Court previously has declined to doubt the sincerity of Plaintiffs' religious (CS) beliefs for purposes of the first step of the RLUIPA analysis.  (ECF No. 57 at PAGEID # 1305.) The Undersigned again sees no need to do so, because Plaintiffs' arguments fail at the second and third steps of the RLUIPA analysis.  The Undersigned will discuss these steps in turn.

### 1.     Substantial Burden on Practice of Religion.

In short, Plaintiffs have provided no evidence to show that the three texts at issue[6] are related to Plaintiffs' religious beliefs, so the confiscation of such texts cannot constitute a substantial burden on Plaintiffs' religious practice.  First, while there is no dispute that the covers of the subject texts all display images of the swastika, Plaintiffs consistently testified that the swastika was not part of their religious practice.  Further, even if swastikas were part of Plaintiffs' religious practice, Plaintiffs have maintained that not all uses of the swastika are religious, so the mere fact that the subject texts contain images of the swastikas does not make the subject texts religious.  But Plaintiffs have failed to provide any evidence from which a

---

[6] *Positive Christianity in the Third Reich*, *Was Adolf Hitler a Bible Christian?*, and *Mein Kampf-The Ford Translation* are hereafter collectively referred to as the "subject texts."

factfinder could conclude that the subject texts are religious such that their confiscations could possibly constitute a substantial burden on Plaintiffs' religious practice.

First, the evidence in the record conclusively undermines Plaintiffs' position that "[t]he use of the swastika by Plaintiffs constitutes religious conduct." (ECF No. 229 at PAGEID # 3783.) Specifically, during the Preliminary Injunction Hearing, Plaintiff Heid repeatedly confirmed to the Court that the swastika was purely an "ethnic symbol" and that it was ***not*** part of the religious doctrine of Christian Separatism:

> THE COURT: So, when members of your faith gather together to worship, or when you seek to worship, is it necessary -- **is it part of your worship ritual that you must have the swastika present?**
>
> MR. HEID: **No. No, it is not.** Also --
>
> THE COURT: **Is the swastika an integral part of your religious doctrine?**
>
> MR. HEID: **No.** No symbolism is an integral part, but it is to the person. And to me, I choose to represent my faith on the cross. And that's the cross that I choose to wear. That's the cross that I choose to see that Christ represented all this to me. And this is much deeper than just that, you know. It is all of that and it is also my people. **It is my ethnic symbol as well.**
>
> ***
>
> THE COURT: I think that we're talking past each other. I think that I'm asking the wrong question because you're answering a different question.
>
> I'm simply trying to determine whether, based on your reliance on either the New Testament or the Old Testament, that either of those texts **require you to use the swastika in your religious services**?
>
> MR. HEID: No. **There's not a requirement.** It is symbolic. It is symbolic speech. Just as any Catholic uses his cross and rosary, or any Protestant uses their cross, it's not required of their tenets either. They have that as symbolic speech.

(ECF No. 58 at PAGEID ## 1332-1334 (emphasis added).)[7]  Accordingly, by Plaintiff Heid's own admissions, the swastika is not part of Plaintiffs' worship ritual, it is neither part of CS's religious doctrine nor a requirement of CS's religious services, and instead it serves as an "ethnic symbol" for Plaintiffs.  (*Id.*)  Indeed, the Court already has reached this conclusion, having found in its March 4, 2019 Opinion & Order that "Plaintiff Heid's use of the swastika is not an integral part of his religious practice."  (ECF No. 57 at PAGEID # 1309.)

Plaintiffs provide no other evidence for the Court to consider on this point, which is somewhat surprising given the Court's previous finding on this dispositive issue.  While Plaintiffs consistently argue that they personally have never used the swastika in an objectionable way, that is not the test under the RLUIPA.  (*See* ECF No. 229 at PAGEID ## 3786-3787 ("Again, the Defendants have not had any security problems with . . . Plaintiffs' use of the swastika.  Nothing in the record suggests that Plaintiffs have ever used the swastika (in any manner) to promote gang activity.").)  Instead, Plaintiffs need to show that they have attempted to use the swastika in a ***religious*** way, and that Defendants have substantially burdened Plaintiffs' attempts to practice their ***religion***.  But Plaintiffs have failed to produce any evidence to this end, despite maintaining that their use of the swastika is religious and that "their use of the swastika is a representation of their Christian faith."  (*Id.* at PAGEID ## 3800, 3816 (internal citations omitted).)

At most, Plaintiffs have demonstrated that they use the swastika to express their Aryan-American identity, but not as a "part of how Plaintiffs worship" CS.  (ECF No. 226-1 at

---

[7] Further, in the operative Second Amended Complaint, Plaintiffs allege that the ODRC policy regarding swastikas is intended "to prevent expression of Aryan ethnicity," and not related to an individual's religious practice.  (ECF No. 227 at PAGEID # 3731 (citing ECF No. 37 at PAGEID # 1162).)

PAGEID # 3501 ("[T]he swastika cross is not an integral part of how Plaintiffs worship . . . because as Christians they don't worship symbols in any type of manner whatsoever.").)[8] [9]  This showing misses the mark, however, as it is only consistent with Plaintiff Heid's previously-cited testimony that he views the swastika as an "ethnic symbol" and the Court's prior finding that the record contains no evidence to support that the swastika is an integral part of Plaintiffs' religious practice.  (*See* ECF No. 58 at PAGEID ## 1332-1334; *see also* ECF No. 57 at PAGEID # 1309 ("There is nothing in the record, or in generally accepted Christian doctrine, however, which supports the swastika as an integral part of the practice of Christianity.  Thus, the Court finds that Plaintiff Heid's use of the swastika is not an integral part of his religious practice.").)

---

[8] Even if the Undersigned were inclined to ignore Plaintiff Damron's statement that the swastika is not a "part of how Plaintiffs worship," and construed Plaintiff Damron's Declaration to mean that the swastika was actually a religious symbol in CS, this lone piece of self-serving testimony – submitted more than two-and-a-half years after the Preliminary Injunction hearing at which Plaintiff Heid provided contradictory testimony – would not be enough to create a genuine issue of material fact on this critical issue.  *Arnold v. United States*, No. 22-5003, 2022 WL 17830617, at *6 (6th Cir. 2022) ("As we have made clear, '[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts . . . earlier deposition testimony.'") (quoting *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986); *see also Webb v. United States*, 789 F.3d 647, 660–61 (6th Cir. 2015) ("Th[e sham affidavit] doctrine prevents a party from submitting a new affidavit to manufacture a factual dispute by contradicting an *earlier* testimony." (citation omitted)).

[9] The Court previously considered "generally accepted Christian doctrine" before finding that "Plaintiff Heid's use of the swastika is not an integral part of his religious practice."  (ECF No. 57 at PAGEID # 1309.)  On appeal, Plaintiffs contended that this constituted error.  (*See* ECF No. 127 at PAGEID # 2169.)  The Sixth Circuit did not decide whether the Court committed error on this issue.  (*See id.*)  Regardless, the Undersigned believes there is a sufficient basis for the Court to consider CS in light of other Christian doctrines given, among many other assertions Plaintiffs have made in this action and the other Related Actions:  (i) Plaintiff Heid's statement that Plaintiffs' "religious texts" are specific translations of the Old Testament and the New Testament of the Bible; (ii) Plaintiff Heid's characterization of CS as "our beliefs of Christianity"; (iii) Plaintiff Damron's statement characterizing Christian Separatists "as Christians"; and (iv) Plaintiffs' characterization of CS as "their Christian faith."  (ECF No. 58 at PAGEID ## 1333-1334; ECF No. 226-1 at PAGEID # 3501; ECF No. 229 at PAGEID # 3816.)

But even if, *arguendo*, Plaintiffs had demonstrated that the swastika was a part of their religious practice, then this only would have been half of the battle. For Plaintiffs allege that Defendants only improperly confiscated certain "religious publications" which contain images of swastikas. Accordingly, Plaintiffs' position also rests on the conclusion that the subject texts are part of Plaintiffs' religious practice. Plaintiffs seem to take this part of the argument for granted, however, as they have provided no evidence to show that the subject texts are part of Plaintiffs' religious practice. Instead, Plaintiffs merely argue that the "religious publications" were confiscated because of their promotion of the swastika and other separatist messaging. (ECF No. 229 at PAGEID # 3790.) Plaintiffs never explain, however, what makes the subject texts "religious publications." (*Id.* at PAGEID ## 3789-3796.)

This oversight is critical, however, because it is clear that Plaintiffs do not believe that **every** depiction of the swastika is part of their religious practice. Indeed, Plaintiffs go to great lengths to detail the depictions of swastikas (permitted by Defendants) which either are not religious or are part of **other** religious practices. (ECF No. 229 at PAGEID ## 3805-3806 (citing ECF No. 59 at PAGEID ## 1527-1541).) Thus, the mere presence of a swastika is not enough to implicate the subject texts as religious for purposes of the subject lawsuit.

But Plaintiffs have failed to demonstrate how any of the subject texts are religious. Instead, at most, Plaintiffs have merely showed that the subject texts are associated with their identities as Aryan-Americans, and they attempt to have the Court conflate this with their identities as Christian Separatists by referring to the swastika as "ethno-religious symbolism." (ECF No. 229 at PAGEID # 3790 ("The use of ethno-religious symbolism on the cover of religious literature constitute[s] religious conduct.").) Plaintiffs consistently overlook the critical

threshold question, however, which is what makes the subject texts religious to begin with.[10] On this point, Plaintiffs' self-serving framing of the subject texts as "religious publications" is insufficient to survive summary judgment. *Servpro Industries, Inc. v. Woloski*, 2022 WL 633844, at *3 (6th Cir. 2022) ("'[C]onclusory assertions, supported only by [a non-moving party]'s own opinions,' do not create genuine disputes of material fact.") (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008)); *Bradley v. Wal-Mart Stores, E., LP*, 587 F. App'x 863, 866 (6th Cir. 2014) ("A properly supported motion for summary judgment will not be defeated by conclusory allegations, speculation and unsubstantiated assertions.") (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

In the end, Plaintiffs have failed to demonstrate how their religious practice involves the swastika, let alone how their religious practice involves the subject texts, so the Undersigned concludes that Plaintiffs have failed to demonstrate how the Defendants' actions could constitute a substantial burden on their exercise of religion. *New Doe Child #1 v. Cong. of United States*, 891 F.3d 578, 589 (6th Cir. 2018) ("The substantial-burden test asks whether the Government is effectively forcing plaintiffs to choose between engaging in conduct that violates sincerely held religious beliefs and facing a serious consequence.") (citing *Burwell v. Hobby Lobby Stores*, 134 S.Ct. 2751, 2775-2776, 189 L.Ed.2d 675 (2014)). Plaintiffs' failure on this threshold issue entitles Defendants to summary judgment on Plaintiffs' RLUIPA claims.

---

[10] Instead, Plaintiffs consistently describe the subject texts as "political." (*See* ECF No. 58 at PAGEID ## 1325 (describing *Mein Kampf* as "political literature"), 1340 (describing "some of" the subject texts as "political in nature"); ECF No. 59 at PAGEID # 1546 (Plaintiff Heid testifying that "the defendants continue to present [*Mein Kampf*] as religious but **it's a political, historical document**.") (emphasis added).)

## 2.    Compelling Governmental Interest; Least Restrictive Means.

Regardless of whether the Court adopts the above analysis, the Undersigned further believes that Defendants are independently entitled to summary judgment on Plaintiffs' RLUIPA claim because they have conclusively proved that the removal of the subject texts was in furtherance of a compelling governmental interest, and that it was the least restrictive means of furthering that compelling governmental interest.  Indeed, it was on this basis that the Court previously denied Plaintiffs' Motion for a Preliminary Injunction.  (ECF No. 57 at PAGEID # 1307 ("Because this Court finds that the State has shown its decisions are the least restrictive means of furthering a compelling governmental interest, however, this Court need not reach the issue of whether Christian Separatism is a religion.").)  On appeal, the Sixth Circuit affirmed the Court's denial for the following reasons:

> **As the district court found, the defendants' evidence established a compelling government interest in maintaining prison safety and security and in controlling the burden placed on ODRC staff to respond to prison altercations or prevent gang activity and affiliations.** *See Cutter*, 544 U.S. at 723. "[O]nce prison officials have provided expert testimony sufficient to justify the security regulation and resultant impingement of prisoner rights, 'the courts must defer to the expert judgment of the prison officials unless the prisoner proves by "substantial evidence . . . that the officials have exaggerated their response" to security considerations.'" *Hoevenaar v. Lazaroff*, 422 F.3d 366, 370 (6th Cir. 2005) (omission in original) (quoting *Espinoza v. Wilson*, 814 F.2d 1093, 1099 (6th Cir. 1987)). In arguing that the defendants have exaggerated their response to security concerns, the plaintiffs point out that ODRC allows display of the swastika by members of the Hindu faith and allows prisoners to access historical fictional and non-fictional narratives about Nazi Germany in books and videos that depict swastikas. The plaintiffs also note that ODRC allows display of the six-pointed Star of David for religious purposes even though that symbol is also a known gang identifier. The defendants asserted, however, that the swastika used in the Hindu religion is different from the swastika used in the challenged texts, and Damron admitted that the two symbols are different "to some degree." With respect to the historical narratives that the plaintiffs noted were allowed in the RCI library, the former RCI librarian, Sally Tamborski, testified that, of those that were still allowed, none promoted white supremacy, Naziism, or white separatist beliefs. And with respect to the six-pointed star, the defendants' witnesses acknowledged that it is used by some gangs as an identifier but explained that, unlike the swastika, it also

is used as a religious symbol. Niceswanger testified that the six-pointed star can be a security threat "depend[ing] on how it's being displayed." On the other hand, Gillum testified that he has never seen a swastika used as a religious symbol, but has seen it used as an identifier by known white supremacy groups. Graves also testified that he has never encountered an inmate who uses the swastika as a "religious identifier" but that the six-pointed star is used as such.

**The plaintiffs also did not offer any alternatives to banning the challenged texts from the library for the defendants to consider as a "least restrictive" alternative.** "Although the government bears the burden of proof to show its practice is the least-restrictive means, it is under no obligation to dream up alternatives that the plaintiff himself has not proposed." *Walker v. Beard*, 789 F.3d 1125, 1137 (9th Cir. 2015). The only relief the plaintiffs have demanded is a return of the challenged texts to the library. Indeed, they assert in their brief that they "specifically requested that the proscribed books be placed in the main library . . . and that their personal books be returned to them." They stated, "[T]he [d]efendants didn't even attempt to show that they considered placing the book back in the library." But the defendants showed that allowing such items in the prison library creates too great of a risk to the safety and security of inmates and corrections officers. **Having failed to show that the defendants exaggerated their response to security concerns and having proposed no alternatives for the defendants to consider, the plaintiffs failed to show that they have a strong likelihood of success on the merits of their RLUIPA claim.**

(ECF No. 127 at PAGEID ## 2171-2172 (emphasis added).)

Nearly three years later, despite having had the benefit of discovery, Plaintiffs have produced no additional evidence that could lead the Court to a different conclusion regarding the merits of Plaintiffs' RLUIPA claim. On the other hand, however, Defendants have only added evidence in support of their position that the subject texts "implicate[] prison concerns." *See Mann v. Wilkinson*, No. 2:00-CV-0706, 2007 WL 4562634, at *5 (S.D. Ohio Dec. 21, 2007) ("[S]ummary judgment would be appropriate only if [the defendants] presented some specific evidence, why this particular item implicates prison concerns.") (quoting *Murphy v. Missouri Dep't of Corr.,* 372 F.3d 979, 986 (8th Cir. 2004)). Specifically, Defendants point to additional testimony from Brian Niceswanger, Eric Graves, and Matthew Gillum, who collectively testified that: (i) the swastika is an "invariably incendiary" symbol used by white supremacists to identify

16

likeminded individuals so they can "group up" to convey contraband, intimidate and harass other inmates, and facilitate extortion, all which prison officials strive to prevent; (ii) violence escalates, to the point where prison staff gets injured, from inmates having symbols such as the swastika; and (iii) it would be difficult, if not impossible, for a prison official to differentiate between an individual who had possession of a swastika for religious purposes and someone who had possession of a swastika for gang purposes, which creates a serious security concern.  (ECF No. 227 at PAGEID ## 3736-3738 (citations omitted).)  This evidence is more than sufficient – especially when uncontroverted[11] – to establish Defendants' compelling government interests.

As for whether Defendants should have considered a less restrictive alternative, Plaintiffs offer a variety of suggestions, including that Defendants' "could have exempted," "permitted," or "approved" the subject texts in some capacity.  (ECF No. 229 at PAGEID # 3828; ECF No. 234 at PAGEID ## 3858-3859.)  But these are the same "alternatives" upon which Plaintiffs have insisted since the beginning of the case,[12] and they fail to address, let alone rebut, Defendants' showing that "allowing such items in the prison library creates too great of a risk to the safety and security of inmates and corrections officers."  (ECF No. 127 at PAGEID # 2172.)

---

[11] Throughout the underlying briefing, Plaintiffs submit no argument – let alone any evidence – to rebut Defendants' position regarding the compelling government interests relative to the subject texts.  (*See generally* ECF Nos. 229, 234.)  Instead, Plaintiffs merely argue that there is no compelling government interest relative to the CS-related CDs or *Christian Principles of National Socialism*.  (*Id.*)  But, as discussed above, Plaintiffs' claims related to the CS-related CDs and *Christian Principles of National Socialism* are moot.

[12] This is not the first time Plaintiffs have simply relied on their desired relief as a "least restrictive alternative."  *See Christian Separatist*, No. 2:15-cv-2757, 2018 WL 1569744, at \*4 (S.D. Ohio Mar. 30, 2018), *aff'd sub nom. Christian Separatist Church Soc'y of Ohio v. Ohio Dep't of Rehab. & Corr.*, No. 18-3404, 2019 WL 1964307 (6th Cir. Feb. 13, 2019) ("A close look at these 'least restrictive alternatives' reveals that they are not, in fact, 'alternatives' at all.").

Again, although the government "bears the burden of proof to show its practice is the least-restrictive means, it is under no obligation to dream up alternatives that the plaintiff himself has not proposed." *Christian Separatist*, 2018 WL 1569744, at *4 (citing *Walker*, 789 F.3d at 1137-38). Further, as with the compelling interest analysis, courts "must afford ODRC due deference in matters touching upon prison security." *Id.* (citing *Blanken v. Ohio Dep't of Rehab. & Corr.*, No. C-2-94-991, 944 F. Supp. 1359, 1368 (S.D. Ohio Oct. 30, 1996); *Cutter*, 544 U.S. at 725 ("It bears repetition . . . that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area.").

Here, while it is true that Defendants' confiscations of the subject texts do not allow Plaintiffs to read them, it is equally true that Defendants do not have an obligation to give every religious prisoner every requested accommodation. *Christian Separatist*, 2018 WL 1569744, at *6. Further, Defendants' uncontroverted evidence confirms that the subject texts are likely to create serious security concerns due to the images of swastikas and the separatist messages they contain. The Undersigned therefore concludes that in light of Defendants' compelling interest in maintaining prison safety and security, Defendants' confiscation of the subject texts is the least restrictive means under RLUIPA.

Accordingly, it is **RECOMMENDED** that the Court **GRANT** Defendants' Motion for Summary Judgment, and **DENY** Plaintiffs' Motion for Summary Judgment, insofar as they pertain to Plaintiffs' RLUIPA claim regarding Defendants' alleged confiscation of *Positive Christianity in the Third Reich*, *Was Adolf Hitler a Bible Christian?*, and *Mein Kampf*.

## C. Plaintiff's Section 1983 Claims.

Plaintiffs also assert several Section 1983 claims against Defendants for alleged violations of their constitutional rights under the First Amendment, Fifth Amendment, and

Fourteenth Amendment.  (*See* ECF No. 37 at PAGEID ## 1170-1174.)  Before addressing the merits of these claims, however, the Court must first review whether they may be time-barred.

### 1.      Statute of Limitations.

As a threshold matter, Defendants argue that the applicable statute of limitations for Section 1983 civil rights actions arising in Ohio expired before Plaintiffs brought their instant claims, and that they are entitled to summary judgment on those claims as a result.  (ECF No. 227 at PAGEID ## 3724-3729.)  This is not the first time Defendants have raised this affirmative defense, and the Court previously adopted the Undersigned's recommendation that Plaintiffs' claims were not time-barred on the face of the operative Second Amended Complaint due to the principle of equitable tolling.  (ECF No. 128 at PAGEID # 2181 (citing ECF No. 75 at PAGEID ## 1698-1700.)[13]  Defendants break down their statute of limitations argument into two parts: first, for Plaintiffs' claims regarding the confiscation of the subject texts; and second, for Plaintiffs' due process claim regarding Plaintiff Heid's inability to present evidence at an RIB hearing arising from the confiscation of a birthday card which depicted a swastika.  (ECF No. 227 at PAGEID ## 3724-3729.)  The Court will discuss the statute of limitations for Plaintiffs' claims in this order.

### a.      Plaintiffs' Confiscation Claims Are Time-Barred.

Defendants' first statute of limitations argument is straight forward:  they believe that under the applicable two-year statute of limitations, Plaintiffs' Section 1983 claims regarding the confiscation of the subject texts are time barred.  (ECF No. 227 at PAGEID ## 3724-3729; ECF

---

[13] Defendants did not object to the Undersigned's previous recommendation.  (*See* ECF No. 128 at PAGEID ## 2182-2183 ("Defendants have failed to file any objections, and the deadline for objections . . . has lapsed.").)

No. 231 at PAGEID ## 3845-3846.)  Specifically, Defendants note that Plaintiffs filed this action

on April 4, 2018, which is more than two years after (i) the final decision on Plaintiff Damron's

appeal regarding the confiscation of *Positive Christianity in the Third Reich* and *Was Adolf*

*Hitler a Bible Christian* (dated November 24, 2015), and (ii) the final decision on Plaintiff

Damron's appeal regarding the confiscation of *Mein Kampf-The Ford Translation* (dated

December 4, 2015).[14]  (*Id.*)  Defendants therefore believe that Plaintiffs' claims related to the

2015 Events are time-barred, and that "any argument for equitable tolling is doomed to failure."

(*Id.*)  In response, Plaintiffs rely exclusively on the Court's prior Order denying Defendants'

statute of limitation argument at the motion to dismiss stage.  (ECF No. 234 at PAGEID # 3854.)

Plaintiffs argue that "Defendants are now trying to relitigate" the "previously dismissed" issue

but "[t]he Law of the Case doctrine must be applied without exception or favoritism."  (*Id.*)

Plaintiffs do not submit any further argument against Defendants' statute of limitations position.

(*Id.*)

Defendants' arguments are well taken, especially in the absence of any substantive

response from Plaintiffs.  First, notwithstanding the Court's previous finding that Plaintiffs'

claims were timely filed, Defendants are entitled to re-raise the argument at the summary

judgment stage.  *MSP Recovery Claims, Series LLC v. Nationwide Mut. Ins. Co.*, Case No. 2:21-

cv-1901, 2022 WL 3572439, at *5 (S.D. Ohio July 25, 2022) ("Defendants are free to reraise this

[statute of limitations] issue at summary judgment."); *Woodall v. Wayne Cnty.*, 590 F. Supp. 3d

---

[14] These events are hereafter collectively referred to as the "2015 Events."  While Plaintiffs were
required to exhaust all available administrative remedies prior to filing suit under the PLRA, it is
uncontested that the 2015 Events constituted the exhaustion of Plaintiffs' available remedies.
*Woodford v. Ngo*, 548 U.S. 81, 126 S. Ct. 2378, 2380, 165 L. Ed. 2d 368 (2006) ("The Prison
Litigation Reform Act of 1995 (PLRA) requires a prisoner to exhaust any available
administrative remedies before challenging prison conditions in federal court.").

988, 997, *reconsideration denied*, 2022 WL 1469210 (E.D. Mich. March 10, 2022) ("Having now had the benefit of discovery and a chance to further investigate and develop the relevant facts, Graham may once again present her statute-of-limitations defense to this Court."); *see also Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (holding that, because the statute of limitations is an affirmative defense, "a motion under Rule 12(b)(6), which considers only the allegations in the complaint, is generally an inappropriate vehicle for dismissing a claim" on this basis).[15]

For these reasons, Plaintiffs' argument in opposition – that Defendants' statute of limitations affirmative defense is barred by the law of the case doctrine – is not well taken.  (ECF No. 234 at PAGEID # 3854.)  The law of the case doctrine "encapsulates a simple idea:  courts generally decline to redecide issues that they have already decided." *Samons v. Nat'l Mines Corp.*, 25 F.4th 455, 463 (6th Cir. 2022) (citing *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)).  The doctrine "promotes judicial efficiency by prohibiting parties from indefinitely relitigating the same issue that a court resolved in an earlier part of the case." *Id.* (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988); 18B Charles Alan Wright *et al.*, Federal Practice and Procedure § 4478, at 648 (3d ed. 2019)).  Though the doctrine is discretionary, a court should adhere to the doctrine "absent extraordinary circumstances showing that the prior decision was clearly wrong and would work a manifest injustice." *Desai v. Geico Cas. Co.*, 541 F. Supp. 3d 817, 823 (N.D. Ohio 2021) (internal citations omitted).

---

[15] The Undersigned also notes that in the first Report and Recommendation, the Undersigned rejected Defendants' arguments, in part, because they "[went] to the merits of Plaintiffs' claims rather than the sufficiency of the pleadings," implicitly inviting Defendants to re-raise such arguments at the summary judgment stage.  (ECF No. 75 at PAGEID # 1699.)

But the law of the case is not an absolute limit on the Court's ability to review issues previously decided, as Plaintiffs appear to believe. *Ominex Energy, Inc. v. Blohm*, 374 F. App'x 643, 652 (6th Cir. 2010) ("A district court's application of the law of the case doctrine to that court's own rulings is reviewed for abuse of discretion because it is a 'discretionary tool' meant to promote judicial efficiency and **not a limit on the court's power**.") (quoting *United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990)) (emphasis added); *see also Janosek v. City of Cleveland*, No. 1:12-CV-823, 2012 WL 3074665, at *3 (N.D. Ohio July 30, 2012), *aff'd*, 718 F.3d 578 (6th Cir. 2013) ("Moreover, the law-of-the-case doctrine **does not remove a district court's jurisdiction to reconsider, or otherwise preclude a district court from reconsidering**, an issue previously decided in the case.") (emphasis added; internal quotation marks and citations omitted).  Indeed, the Court "can reconsider its own prior ruling when there is a 'cogent reason' to do so, such as the presentation of new evidence," which is what Defendants have provided in the subject briefing.  *Cone v. Tessler*, No. 16-11306, 2019 WL 1515267, at *5 (E.D. Mich. Apr. 8, 2019), *aff'd*, 800 F. App'x 405 (6th Cir. 2020) (citing *Ominex Energy, Inc.*, 374 F. App'x at 651).

Here, as the Undersigned discussed in the previous Report and Recommendation, the operative Second Amended Complaint contains adequate allegations of fact which, when taken as true and construed in Plaintiffs' favor, allowed the Court to conclude that "Plaintiffs had attempted to 'supplement' their Complaint in the [*Christian Separatist*] action with the claims at issue in the above-captioned case" for purposes of surviving Defendants' Motion to Dismiss. (ECF No. 75 at PAGEID # 1700.)  *See Rembisz v. Lew*, 590 Fed.Appx. 501, 504 (6th Cir. 2014) ("At the motion to dismiss stage, courts are bound to accept the well-pleaded allegations of a

22

complaint as true and to draw inferences and resolve ambiguities in a plaintiff's favor.") (internal citations omitted).

But now, at the summary judgment stage, the stakes are different.  The Court must look beyond the pleadings to see if any genuine issue of material fact exists as to when Plaintiffs' claims accrued, or if any tolling principles apply.  *FIP Realty Co. v. Ingersoll-Rand PLC*, 522 F. Supp. 3d 335, 339 (S.D. Ohio 2021) (Marbley, C.J.) ("Summary judgment on statute of limitations grounds is appropriate if the limitations period has run and if there is no genuine issue of material fact as to when the plaintiff's cause of action accrued.") (citing *Campbell v. Grand Trunk Western R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001) (citing *Fries v. Chicago & Northwestern Transp. Co.*, 909 F.2d 1092, 1094 (7th Cir. 1990))).  Accordingly, the Undersigned can, and will, re-evaluate Defendants' argument at the summary judgment stage.  For the reasons discussed below, the Undersigned finds that Defendants have provided sufficient, uncontroverted evidence from which the Court can only conclude that Plaintiffs' claims are time- barred.

"The statute of limitations applicable to claims arising under 42 U.S.C. § 1983 is the two-year statute of limitations[.]"  *Wilder v. Collins*, No. 2:12-cv-0064, 2012 WL 786855, at *2 (S.D. Ohio March 9, 2012) (citing *Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989)).  "Although the date of accrual for a § 1983 claim is a matter of federal law, state tolling principles apply to determine the timelines of claims."  *Id.* at *2 (quoting *Davis v. Clark County Bd. of Com'rs*, No. 2:12-cv-0064, 2010 WL 333651, at *12 (S.D. Ohio Jan. 21, 2010) (citing *Wilson v. Garcia*, 471 U.S. 261, 268-69, 105 S.Ct. 1938, 83 L.Ed.2d 254 (1985))).  In general,

> equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control. *Graham–Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 561 (6th Cir. 2000) (citations omitted). "Absent compelling equitable considerations, a court should not extend limitations by even a single day." *Id.* at 561. Additionally, "neither 'excusable neglect' nor ignorance of the law are sufficient to invoke

23

equitable tolling." *See Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991) ("It is well-settled that ignorance of the law alone is not sufficient to warrant equitable tolling"); *Harris v. Hutchinson*, 209 F.3d 325, 329–30 (4th Cir. 2000) (equitable tolling should apply only where petitioner is prevented from asserting his claim by wrongful conduct of the respondent or where extraordinary circumstances beyond the petitioner's control make it impossible to file the claim on time).

There are five factors to consider when determining the appropriateness of tolling a statute of limitations: "1) lack of notice of the filing requirement; 2) lack of constructive knowledge of the filing requirement; 3) diligence in pursuing one's rights; 4) absence of prejudice to the defendant; and 5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement." *Truitt v. Cnty. of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998).

*Davis*, 2010 WL 333651 at *12.  Because Defendants raise the two-year statute of limitations as an affirmative defense, they carry the burden of showing that it has run.  *FIP Realty Co.*, 522 F. Supp. 3d at 339.

Defendants have carried their burden.  Specifically, they have provided uncontroverted documentary and testimonial evidence that each of the 2015 Events occurred more than two years before April 4, 2018, when this Plaintiffs initiated this case.  (ECF No. 227 at PAGEID ## 3724-3725 (citing ECF No. 58 at PAGEID ## 1408-1409 (regarding *Mein Kampf*), 1417 (regarding *Positivity Christianity in the Third Reich*), 1424-1425 (regarding *Was Adolph Hitler a Bible Christian?*).)  Accordingly, the only way for Plaintiffs' Section 1983 claims arising out of the 2015 Events to survive would be for the Court to apply equitable tolling.

At the motion to dismiss stage, the Undersigned noted Plaintiffs' allegation that "any delay in filing [Plaintiffs'] claims was not due to their own failure or negligence," but rather as "a result of a legal misrepresentation made by the Defendants."  (ECF No. 75 at PAGEID # 1699 (citing ECF No. 37 at PAGEID ## 1169-1170.)  The Undersigned rejected Defendants' effort to consider evidence beyond the Second Amended Complaint, found support for Plaintiffs' contention, and ultimately recommended that "in the limited circumstances of this case . . .

Defendants' Motion to Dismiss be denied on statute of limitations grounds." (*Id.* at PAGEID # 1700.)

At the summary judgment stage, however, the Undersigned is compelled to reach the opposite conclusion in light of additional evidence. As Defendants have proven – again, with no substantive opposition from Plaintiffs – equitable tolling is inappropriate in this case because the delay in Plaintiffs filing this action did not unavoidably arise from circumstances beyond Plaintiffs' control. *See Graham–Humphreys*, 209 F.3d at 561. Specifically, even though Plaintiffs' equitable tolling argument is entirely premised on the allegation that Defendant Clark made a "legal misrepresentation" to Plaintiffs, there is no evidence in the record of Defendant Clark making *any* such statement to Plaintiffs. Instead, the only relevant evidence in the record is a letter Defendant Clark sent to another inmate, David LaPrade, on November 24, 2015, which references a "discussion" between Defendant Clark and Mr. LaPrade:

> Q.  This is Defendant's Exhibit 10, page 1 of 2. Are you familiar with this exhibit?
>
> A.  Yes. **It's the letter to David Laprade.**
>
> Q.  Does it have your name in there? Read the second paragraph.
>
> A.  "I understand from talking to Inspector Diehl that you have several grievances pending on these issues. I have copied him on this response, and I have directed him to answer the grievances submitted by you, Damron and Heid consistent with the positions and decisions described below. **As I've explained to you during our discussion, you may continue to use and exhaust the grievance process and add any of these issues to your existing lawsuit if you so choose**."
>
> Q.  What existing lawsuit was that?
>
> A.  That was Christian Separatist Church Society vs. ODRC, 2757.
>
> Q.  Did you attempt to amend them claims to that lawsuit?
>
> A.  Yes, and I was denied.

Q.     **Is that why the delay took place in the filing of this complaint?**

A.     **The delay, yes.**

(ECF No. 58 at PAGEID ## 1436-1437 (emphasis added).)

But this evidence does not support Plaintiffs' equitable tolling position.  Critically, the letter was not addressed to Plaintiffs, and it expressly references a "discussion" between only Defendant Clark and Mr. LaPrade – not between Defendant Clark and Plaintiffs.  (*Id.*)  And while Defendant Clark's letter to Mr. LaPrade notes that Mr. LaPrade "may continue to use and exhaust the grievance process and add any of these issues to your existing lawsuit if you so choose," there is no evidence that connects Mr. LaPrade's issues to Plaintiffs.

On this point, the Undersigned notes that Plaintiffs and Mr. LaPrade were Co-Plaintiffs in the *Christian Separatist* action, but it is nevertheless clear to the Undersigned that these individuals each had unique concerns.  For example, Plaintiff Damron confirmed that Mr. LaPrade has not attempted to join the subject lawsuit "in any way, shape, or form."  (ECF No. 58 at PAGEID ## 1418-1419.)  The Undersigned can therefore not conclude – especially in the absence of any corroborating evidence – that Mr. LaPrade's "discussion" with Defendant Clark related to any of Plaintiffs' claims in this action, or that the "issues" Defendant Clark referred to in the letter to Mr. LaPrade related to any of Plaintiffs' claims in this action.[16]

As a result, there is no evidence to support Plaintiffs' allegation that Defendant Clark "misrepresent[ed]" or "fraudulently concealed the fact that [Plaintiffs'] claims were to be filed as

---

[16] The Undersigned also notes that Defendant Clark's letter to Mr. LaPrade is dated November 24, 2015, which was one day after the final decision on Plaintiff Damron's appeal regarding the confiscation of *Positive Christianity in the Third Reich* and *Was Adolf Hitler a Bible Christian* (November 24, 2015) and ten days **before** the final decision on Plaintiff Damron's appeal regarding the confiscation of *Mein Kampf-The Ford Translation* (December 4, 2015).

a separate action," which is the sole basis on which Plaintiffs believe equitable tolling is appropriate.  (ECF No. 37 at PAGEID # 1170 (Alleging that were it "not for the misrepresentation Plaintiffs' claims would have been filed in a timely and appropriate manner.").)  Without any factual basis, Plaintiffs' equitable tolling argument fails.  *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013) ("Because the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run," and "[i]f the defendant meets this requirement then the burden shifts to the plaintiff to establish an exception to the statute of limitations.") (internal citations omitted).

Accordingly, it is **RECOMMENDED** that the Court **GRANT** Defendants' Motion for Summary Judgment, and **DENY** Plaintiffs' Motion for Summary Judgment, insofar as they pertain to Plaintiffs' Section 1983 claims regarding the removal of *Positive Christianity in the Third Reich*, *Was Adolf Hitler a Bible Christian*, or *Mein Kampf-The Ford Translation*, as such claims are time-barred.

### b.  Plaintiffs' Due Process Claim Is Time-Barred.

Plaintiffs also pursue a claim for a violation of Plaintiff Heid's due process rights under the Fifth Amendment, alleging that Defendants failed to provide Plaintiff Heid with at least 24 hours' notice of an RIB hearing related to the confiscation of a birthday card.  (ECF No. 37 at PAGEID ## 1162-1164.)  Plaintiffs specifically allege that Defendants failed to follow Ohio Administrative Code Rule 5120-9-08, which establishes Plaintiff Heid's right to establish a defense and appeal.  (*Id.* at PAGEID # 1163.)  In the subject briefing,  Plaintiff Heid maintains that he was "unable to present documentary evidence in his defense" as a result.  (ECF No. 229 at PAGEID # 3828.)  In response, Defendants argue that "there is no constitutional violation"

27

and that Plaintiffs' claim is barred by the two-year statute of limitations.  (ECF No. 231 at PAGEID ## 3845-3846.)

Defendants' statute of limitations argument is well taken.  As Defendants correctly observe, RIB decisions are not subject to the administrative grievance process.  *See* Ohio Admin. Code § 5120-9-31(B) ("The inmate grievance procedure will not serve as an additional or substitute process for . . . rules infraction board decisions.").  Plaintiffs therefore were not required to exhaust all available administrative remedies prior to filing suit.  *Hanrahan v. Mohr*, No. 2:13-CV-1212, 2017 WL 1134772, at *8 (S.D. Ohio Mar. 24, 2017), *aff'd*, 905 F.3d 947 (6th Cir. 2018) (noting that "inmates are only required to exhaust grievable matters" under PLRA) (citing Ohio Admin. Code § 5120-9-31(B)).  As a result, the two-year statute of limitations for Plaintiffs' claim began running on October 20, 2015 – the day of Plaintiff Heid's RIB hearing. But Plaintiffs did not file the subject action until April 4, 2018, more than five (5) months after the statute of limitations ran.  (ECF No. 1.)  Plaintiffs' due process claim related to the RIB hearing is therefore time-barred.[17]  Accordingly, it is **RECOMMENDED** that the Court **GRANT** Defendants' Motion for Summary Judgment, and **DENY** Plaintiffs' Motion for Summary Judgment, insofar as they pertain to Plaintiffs' due process claim.

2.     **Plaintiffs' First Amendment Claims.**

In the event the Court determines that Plaintiffs' confiscation claims are not time-barred, the Undersigned finds it prudent to discuss the merits of Plaintiffs' Section 1983 claims, beginning with Plaintiffs' claims for violations of their First Amendment rights.

---

[17] For the same reasons discussed above, Plaintiffs' argument regarding equitable tolling is not well taken.

The First Amendment, made applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. "Prisoners retain the First Amendment right to the free exercise of their religion." *Hayes v. Tennessee*, 424 F. App'x 546, 549 (6th Cir. 2011) (citing *Walker v. Mintzes*, 771 F.2d 920, 929 (6th Cir. 1985)). "Under § 1983, a prisoner alleging that the actions of prison officials violate his religious beliefs must show that the belief or practice asserted is religious in the person's own scheme of things and is sincerely held." *Barhite v. Caruso*, 377 F. App'x 508, 510 (6th Cir. 2010) (citation and internal quotation marks omitted). The prisoner must also show that the prison's action substantially burdens their sincerely held religious beliefs. *Id.* "An action of a prison official will be classified as a substantial burden when that action forced an individual to choose between following the precepts of his religion and forfeiting benefits or when the action in question placed substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Hayes*, 424 F. App'x at 554-55 (internal quotation marks and citations omitted). Under Section 1983, if the action substantially burdens a prisoner's sincerely held beliefs, the action "is valid if it is 'reasonably related to legitimate penological interests.'" *Colvin v. Caruso*, 605 F.3d 282, 296 (6th Cir. 2010) (quoting *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

In *Turner,* the United States Supreme Court held that four factors are relevant in balancing the deference owed to prison policies designed to maintain security and discipline with the important need to protect inmates' constitutional rights. *Turner*, 482 U.S. at 85-89. The four factors are as follows:

(1)    whether the regulation has a "valid, rational connection" to a legitimate governmental interest;

(2)    whether alternative means are open to inmates to exercise the asserted right;

(3)      what impact an accommodation of the right would have on guards and inmates and prison resources; and

(4)      whether there are "ready alternatives" to the regulation.

*Id.* at 89–91. If the first factor is not present, the regulation is unconstitutional, and the other factors do not matter. *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999); *Muhammad v. Pitcher*, 35 F.3d 1081, 1084 (6th Cir. 1994). The remaining factors are considerations that must be balanced together. *Spies*, 173 F.3d at 403 (quoting *Turner*, 482 U.S. at 90–91, 107 S.Ct. 2254). "Under the first *Turner* factor, Defendants' motivation matters." *Nixson v. Davis*, No. 2:18-cv-1720, 2020 WL 1929363, at *4 (S.D. Ohio April 21, 2020). Thus, their "conduct was reasonable only if [they] denied Plaintiff's request for a legitimate penological reason." *Id.*

Here, Plaintiff's First Amendment claims fail for the same primary reason that their their RLUIPA claims fail: they have not shown how Defendants have substantially burdened their sincerely-held CS beliefs. For this analysis, the Undersigned again need not examine the sincerity of Plaintiffs' CS beliefs (or whether CS is a sincerely held "religious" belief, notwithstanding Plaintiff Heid's testimony that CS is "political in nature"), because the evidence is clear that the subject texts do not implicate Plaintiffs' religious practice. As discussed above, Plaintiffs have conceded that the subject texts are "political," that the swastika is an "ethnic symbol" that "is not an integral part of [their] religious practice." Moreover, they have failed to argue (let alone prove) that they even use the subject texts as part of their CS practice. Because Plaintiffs have failed to prove that the subject texts implicate their sincerely-held CS beliefs, it is impossible for the Undersigned to conclude that Defendants' actions could have substantially burdened Plaintiffs' religious practice.

Regardless, the undisputed facts clearly establish that Defendants confiscated the subject texts for legitimate penological reasons.[18]  First, as discussed above, it is clear that Defendants' confiscation of symbols and messaging that is "invariably incendiary" and is known to lead to violence within prisons is logically connected to Defendants' interest in eliminating potential threats to the security or order of prison facilities.  *Ballard v. Campbell*, 191 F.3d 451 (Table), 1999 WL 777435, at *2 (6th Cir. 1999) ("The purpose of the policy is to eliminate potential threats to the security or order of the facility.  Clearly, this is a legitimate interest.") (citing *Pell v. Procunier,* 417 U.S. 817, 823 (1974)).  Regarding the other *Turner* factors, it is further clear to the Undersigned from the evidence in the record that there are no "ready alternatives" and that permitting the subject texts to remain accessible to all inmates would have a decidedly negative impact on prison officials.  According to the undisputed testimony from the Preliminary Injunction hearing, violence "absolutely" escalates from inmates having symbols such as swastikas, and it is in those exact scenarios "where [prison personnel] get hurt."  (ECF No. 58 at PAGEID ## 1485-1486.)  To this end, while Plaintiffs maintain that their personal use of the swastikas have never resulted in violence, this argument misses the point because Defendants have submitted overwhelming (and uncontroverted) evidence that the presence of white supremacist symbols and messages in the prison environment "absolutely" results in violence. (*Id.* at PAGEID # 1485-1486.)

Here, as was the case for Plaintiffs' RLUIPA claim, because Defendants have sufficiently demonstrated that the subject texts would create a potential danger to institutional security, "courts must defer to the expert judgment of the prison officials unless the prisoner proves by

---

[18] This conclusion obviates the need for the Undersigned to address the sincerity of Plaintiffs' beliefs.

substantial evidence . . . that the officials have exaggerated their response to security

considerations."  *Espinoza*, 814 F.2d at 1099 (internal quotation marks and citation omitted).

But once again, Plaintiffs have failed to do so.  Instead, Plaintiffs merely argue that Defendants'

actions are not reasonable because Defendants allow the swastika to be displayed in other

manners, including on other library books.  (ECF No. 229 at PAGEID ## 3796-3798 (internal

citations omitted).) [19]  But this argument ignores Defendants' concern, which is that the

promotion of separatist messaging, including the swastika in certain contexts, creates a security

concern.  (*See* ECF No. 227-1 at PAGEID # 3768 ("Espousing a belief in racism or violence . . .

will result in the incarcerated individual being profiled as STG since by that individual's own

admission he or she poses a compelling safety and security threat to the institution and, thus,

must be managed differently . . . in order to mitigate the risk of an altercation which results in

physical injury or death.").)  And on this point, Plaintiffs have no rebuttal.

Accordingly, it is **RECOMMENDED** that the Court **GRANT** Defendants'

Motion for Summary Judgment, and **DENY** Plaintiffs' Motion for Summary Judgment,

insofar as they pertain to Plaintiffs' First Amendment claims.

### 3.    Plaintiffs' Fourteenth Amendment Claim.

Finally, Plaintiffs claim that Defendants' actions have violated their right to equal

protection under the Fourteenth Amendment.  (ECF No. 229 at PAGEID ## 3819-3827.)  "The

Equal Protection Clause safeguards against the disparate treatment of similarly situated

individuals as a result of government action that 'either burdens a fundamental right, targets a

---

[19] During the Preliminary Injunction hearing, Plaintiff Heid testified that "there is no difference" between the subject texts, which glorify Adolf Hitler and espouse separatist views, and a novel entitled *Eye of the Needle*, which "shows Nazis in a negative connotation."  (ECF No. 58 at PAGEID ## 1387-1388.)

suspect class, or has no rational basis.'"  *Paterek v. Vill. of Armada, Mich.*, 801 F.3d 630, 649
(6th Cir. 2015) (quoting *Ctr. for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th
Cir. 2011)).  To prevail on their class-of-one theory, Plaintiffs must overcome a "heavy burden"
and demonstrate that they were treated differently than those similarly situated "in all material
respects."  *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012) (internal quotations
and citation omitted).

Here, Plaintiffs argue that their "CS faith is similarly-situated in relevant respects with
the faith groups of Black Hebrew Israelites and Rastafarians" because "all three faith groups
appeal to race," "[a]ll three faith groups teach racial separation" and "use . . . an STG symbol in
a religious context."  (ECF No. 229 at PAGEID # 3819.)  Specifically, Plaintiffs equate their use
of the swastika to how Black Hebrew Israelites and Rastafarians use the six pointed star, and
they argue that "[b]oth symbols . . . pose the same security threat to the institutions" because
both symbols "are used by gang members," both "can be used to identify with gang members
and to group up," both "can be used to intimidate and threaten other inmates," and both "are
often used as exact replicas in their gang use as in their religious use." (*Id.* at PAGEID ## 3819-
3820.)

Plaintiffs' argument is not well taken for a number of reasons.  First, this Court
previously held that unlike Christian Separatists, Black Hebrew Israelites and Rastafarians "do
not hold the supremacy of a particular race as a fundamental tenet" and "are therefore not
similarly situated to [Christian Separatists] in the relevant respects."  *Heid v. Marbley*, No. 2:20-
CV-1512, 2020 WL 3887800, at *3 (S.D. Ohio July 10, 2020), *appeal dismissed*, No. 20-3812,
2021 WL 4128957 (6th Cir. Apr. 23, 2021), *cert. denied*, 142 S. Ct. 468 (2021).  Plaintiffs have
provided no evidence to allow the Undersigned to reach any other conclusion in this matter.

33

While Plaintiffs maintain that they do not believe in the supremacy of any particular race, the Undersigned finds that such self-serving attestations are not made in good faith and are undermined by the evidence in the record.[20]  Additionally, even if the Undersigned accepted all of Plaintiffs' arguments regarding Black Hebrew Israelites and Rastafarians and the six pointed star,[21] Plaintiffs have failed to demonstrate how they use the swastika for religious purposes, as extensively discussed herein.  It is therefore impossible for the Undersigned to conclude that Plaintiffs are similarly situated "in all material respects" to Black Hebrew Israelites and Rastafarians.  *Loesel*, 692 F.3d at 462.

The Undersigned further rejects Plaintiffs' attempt to invoke strict scrutiny by framing themselves as a "suspect class" as Aryan-Americans.  (ECF No. 229 at PAGEID ## 3822-3823.) Unsurprisingly, Plaintiffs cite no legal authority for this designation.  "Suspect class" typically refers to "a group of people identified by their race, alienage, or national origin."  *Burnette v. Bredesen*, 566 F. Supp. 2d 738, 746 (E.D. Tenn. 2008) (citing *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985)).  "In determining whether a class is suspect . . . courts examine whether the class historically has been subjected to discrimination, whether members of the group 'exhibit obvious, immutable, or distinguishing characteristics that define them as a

---

[20] During the Preliminary Injunction hearing, for example, Plaintiff Heid testified that he believes that "[a]nyone who is not white is . . . not the same order as God defines the order of arrangement which is man," and that "[w]hat is today called the Negro race was an original creation of the animal kingdom, and is not of the same species of Adamic [white] man."  (ECF No. 58 at PAGEID ## 1365-1366.)

[21] To be clear, the evidence in the record does not support Plaintiffs' characterizations.  First, for example, Defendant Graves testified during the Preliminary Injunction hearing that while the six pointed star "could be" a religious identifier, it is "done up a little bit different" when it is used as a religious identifier compared to when it is used as a gang symbol.  (ECF No. 58 at PAGEID # 1493.)  Further, the evidence consistently shows that Defendants have never witnessed prisoners who use the swastika as a religious identifier.  (*Id.* at PAGEID ## 1493, 1498, 1500, 1506-1507.)

discrete group,' and whether the group is 'a minority or politically powerless.'" *Bassett v. Snyder*, 951 F. Supp. 2d 939, 959 (E.D. Mich. 2013) (quoting *Lyng v. Castillo*, 477 U.S. 635, 638 (1986)).

On this issue, Plaintiffs simply state their opinion that they are similarly situated to other protected classes – specifically, to African Americans and Jewish Americans – because "[a]ll three ethnicities exist in ODRC facilities"; "[a]ll three ethnicities have class members whom are racially separatists individuals within ODRC"; "[a]ll three ethnicities consist of racially separatists religions among their class members within ODRC"; and "all three ethnicities have separatists religionists who use STG identifiers in a religious context within ODRC." (ECF No. 229 at PAGEID # 3823.) Once again, however, Plaintiffs provide no support for these comparisons. In the absence of any evidence from which a factfinder could conclude that Plaintiffs are so similarly situated, Plaintiffs' bare assertions do not persuade the Undersigned that they meet the standard for a protected class. *See Aderholt*, No. 2:20-CV-0901, 2022 WL 3025431, at *6 (S.D. Ohio Aug. 1, 2022) ("Plaintiffs' bare assertion does not persuade the Court that Christian Separatists meet this standard.").

Accordingly, it is **RECOMMENDED** that the Court **GRANT** Defendants' Motion for Summary Judgment, and **DENY** Plaintiffs' Motion for Summary Judgment, insofar as they pertain to Plaintiffs' equal protection claims.[22]

---

[22] Because the Undersigned recommends that Defendants be granted summary judgment on all of Plaintiffs' claims, there is no need to discuss whether Defendants would have been immune from Plaintiffs' damages claims. The Undersigned notes, however, that the Court only rejected Defendants' qualified immunity argument at the Motion to Dismiss stage because it appeared to have been copied and pasted from one of Plaintiffs' related cases and "made no argument relevant to the facts of this case." (*See* ECF No. 75 at PAGEID ## 1706-1708.)

**IV.**

For the reasons stated above, the Undersigned **RECOMMENDS** that the Court **GRANT** Defendants' Motion for Summary Judgment, ECF No. 227, **DENY** Plaintiffs' Motion for Summary Judgment, ECF No. 229, and award summary judgment in Defendants' favor on all of Plaintiffs' claims.

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review of by the District Judge and waiver of the right to appeal the judgment of the District Court. Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . ." (citation omitted)).

Date: February 7, 2023         ___*/s/ Elizabeth A. Preston Deavers*___
                                    **ELIZABETH A. PRESTON DEAVERS**
                                    **UNITED STATES MAGISTRATE JUDGE**